Edgar Alexander Barrera
22159 Ladera Street
Grand Terrace, CA 92313    310-770-8923

March 2nd 2016

Clerk of Court

United States Court of Appeals for the Federal Circuit

717 Madison Place, NW

Washington, DC 20439

**RECEIVED**

**MAR 07 2016**

United States Court of Appeals
For The Federal Circuit

To this Honorable Court,

Re: Information regarding express mail to the wrong address. We sent it the correct date, February 25, 2018.

The documentation of this Appeal was sent to the wrong address below. I've sent it before the due date. I will be sending it to the correct address via USPO to 717 Madison Place, NW. Washington, DC 20439.

It was sent before to:

Director of the U.S Patent and Trademark Office
Office of the Solicitor
Mail Stop 8, P.O 1450
Alexandria, VA 22313-1450

Thanking you,

Yours Truly,

Edgar Alexander Barrera
Appellee/Registrant



U.S. POSTAGE
$14.30
PM 2-DAY
32174 0006
Date of sale
02/25/16
06  2S00
08440232

# PRIORITY MAIL 2-DAY™

EXPECTED DELIVERY 02/29/2016

SHIP
TO:

1 lb. 12.70 oz.

**0006**

PO BOX 1450
ALEXANDRIA VA 22313-1450

## USPS CERTIFIED MAIL™



9502 8000 1663 6056 0005 08

---

Filed: 03/16/2016 ND BCH
260 WILLIAMSON BLVD
ORMOND BEACH, FL 32174-9998

02/25/2016                    08:24:19 PM

| Product Description | Sales Receipt Sale Qty | Unit Price | Final Price |
|---|---|---|---|

ALEXANDRIA, VA  22313-1450              $9.45
Zone-5
Priority Mail 2-Day™ with up to
$50.00 Insurance and USPS
Tracking™ included
%% USPS Certified Mail™:
9502 8000 1663 6056 0005 08
1 lb. 12.70 oz.
* Expected Delivery Day Monday,
February 29.
Certified Mail™                          $3.45
Return Receipt (email)                   $1.40
                                       ========
Issue Postage:                          $14.30

Total:                               =========
                                        $14.30

Paid by:
DebitCard                                $14.30
  Account #:       XXXXXXXXXXXX1584
  Approval #:      148666
  Transaction #:   904
  23-902300086-99
  Receipt #:       131086

SSK Transaction #:            85
USPS® #                       118952-9550

**************************************
*  IMPORTANT: For Return Receipt (by  *
*  email), wait at least one day, but *
*  no more than 60 days, to make your *
*  request; visit USPS.com; select    *
*  "Track & Confirm"; enter label     *
*  number(s); select "Request Return  *
*  Receipt (Electronic)"; enter your  *
*  name and email address.            *
**************************************

%% Text your tracking number to 28777
(2USPS) to get the latest status.
Standard Message and Data rates may
apply. You may also visit USPS.com
USPS Tracking or call 1-800-222-1811,
or use this self-service kiosk (or any
self-service kiosk at other Postal
locations).

Save this receipt as evidence of
insurance. For information on filing
an insurance claim go to
https://www.usps.com/help/claims.htm.

Thanks.
It's a pleasure to serve you.

ALL SALES FINAL ON STAMPS AND POSTAGE.
REFUNDS FOR GUARANTEED SERVICES ONLY.

# United States Court of Appeals for the Federal Circuit

---

**RECEIVED**

MAR 07 2016

United States Court of Appeals
For The Federal Circuit

**Steven Westlake,**

*Appellant*

v.

**Edgar Alexander Barrera**

*Appellee / Registrant*

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board.

---

February 22, 2016

---

Argued by appellee/Registrant.

---

## THE ARGUMENT

Edgar Alexander Barrera, the Appellee/Registrant, respectfully requests this Honorable Court to consider this motion as the interest of justice can be served.

The Appellant-Petitioner and his attorneys have used subterfuge. The Appellant, Steven A. Westlake has consciously deliberately lied: he fabricated "evidence." False statements either were made recklessly or with knowledge of their falsity. Appellant committed perjury to the Trademark Trial and Appeal Board (TTAB).

The Appellant's claims are total shams and everything's has been a figment of his crazed imagination, absolutely committed perjury.

The Appellant has "unclean hands."

Will rely upon the United States Patent and Trademark Office Trademark Trial and Appeal Board—decision—can't state it any better than what they did.

Appellant did not give any Expert Disclosures, Discovery Closed, No Pretrial Disclosures Closed, No 30-day Trial Period Ended, Appellant's Rebuttal Disclosures, Appellant's 15-day Rebuttal Period Ended. Nothing was in any way of these by the Appellant.

| Expert Disclosures Due | 3/ 31/ 2014 |
| Discovery Closes | 4/ 30/ 2014 |
| Appellant's Pretrial Disclosures | 6/ 14/ 2015 |
| Appellant's 30-day Trial Period Ends | 10/12/2014 |
| Appellant's 15-day Rebuttal Period Ends | 11/11/2014 |

In each instance, a copy of the transcript of testimony together with copies of documentary exhibits must be served on the adverse party within thirty days after completion of the taking of testimony. Trademark Rule 2. 125, there were no transcript of testimony together documentary exhibits. As there were none whatsoever.

Briefs shall be filed in accordance with Trademark Rules 2. 128 (a) and (b). An oral hearing will will be set only upon request filed as provided by Trademark Rule 2. 129. No briefs or an oral hearing or requested, whatsoever.

## "AFFIDAVIT OF PETITIONER'S ATTORNEY"

"Mark Levy, attorney for the Petitioner, affirms the following facts."

"1. On February 12, 2015, I completed a Response to the Order to Show Cause dated January 28, 2015 and forwarded same to my paralegal, Ms. Amy Manzer, by email. I expect the completed response would be filing that evening or, at the latest, the morning of February 13, 2015."

"3. In the normal course of business, I often correspond with Ms. Manzer by email."

This is what the Appellant's Attorney is stating in his own exact words on "Page 1 of 3."

The Appellant's Attorney correctly states he had to give a Response to the Order to Show Cause dated January 28, 2015.

The Board stated on that particular date: "In view thereof, Petitioner is allowed fifteen days from the date of this order to show cause why judgment should not be rendered against him for failure in to prosecute this case, failing which judgment may be entered against Petitioner." "Mailed: January 28, 2015"

Wednesday, January 28, 2015 "Petitioner is allowed fifteen days from the date of entry this order" which is allowed until Wednesday, February 11, 2015. Very simple, but the Appellant's Attorney states he will respond on February 12, 2015 a date later. And states he expect the complete response would be filed that evening or, at the latest, the morning of February 13, 2015. Which is two days after the allowed fifteen days of this order.

The "Affidavit of Petitioner's Attorney Paralegal, Amy Manzer" states she: "was in a severe accident on February 8, 2015, deploying her air bags, injuring her chest and back, and totaling the car. Ms. Manzer visited a physician at the local hospital to receive medical treatment for her back on February 10, 2015. If she was injured why did she wait three days to receive medical treatment. And all of this happened before the evening of February 12, 2015 or the morning of February 13, 2015 which is two days after the allowed fifteen days of the Board order. By in their their own words state it was not going to be sent in the correct time before her accident.

Likewise the Appellant's Attorney also states: "In the normal course of business, I often correspond with Ms. Manzer by email." He would have then known this already had happened since he corresponds in the normal cause by email daily with her. The whole story does not add up at all about this particular matter.

The Appellant's Attorney, Mark Levy or The "Affidavit of Petitioner's Attorney Paralegal, Amy Manzer." Neither documents were sworn or subscribed to before by any Notary Public as well.

Wendy Boldt Cohen, Interlocutory Attorney sent:
"Mailed: January 28, 2015"

"Notwithstanding the foregoing, the Board notes that the time for the Petitioner to take testimony has expired2 and the record demonstrates that Petitioner has failed to submit any evidence or take any testimony during its assigned testimony period. Cf. Trademark Rule 2.132 and TBMP §534. In view thereof, Petitioner is allowed fifteen days from the date of this order to show cause why judgment should not be rendered against him for failure to prosecute this case, failing which judgment may be entered against Petitioner. Id. Proceedings are otherwise suspended. Any paper filed during the pendency of this show cause order which is not relevant thereto will be given no consideration. 2 Petitioner's trial period ended July 29, 2014."

I respectfully respect this Honorable Board as the interest of justice can be served.

## Introduction

### Evidence that Plaintiff Lied Under Oath to the TTAB

The Respondent hereby submits substantial and credible information that the Plaintiff and his Attorneys obstructed justice by lying under oath and concealing evidence. The Plaintiff and his Attorneys lied under oaths and obstructed justice before the United States Patent Trademark Office (USPTO), and submitted affidavits in support of their "Brief in Support of Judgment for Petitioner."

### Plaintiff's Statements Under Oath to the TTAB

There is substantial and credible information supporting the following five possible grounds (A to F) for concealing evidence.

  A. The Plaintiff, Steven Westlake lied under oath to the TTAB:

"Steven Westlake, being sworn deposes and states:

1. I am the petitioner in the instant matter before the United States Patent and Trademark office (USPTO), and I submit this affidavit in support of the Brief in Support of Judgment for Petitioner, concurrently submitted.

2. On April 7, 2007, no other party was used the National Police Gazette mark in commerce in any channel and no periodical under that name and/or mark had been published since January, 1977."

"15. For the foregoing reasons, I submit that Registration's appearance in this litigation has completely been a sham; that he has never had a good-faith intention to participate. He is merely proceeding so that he can help his name attached to a notable trademark. Therefore, I respectfully ask that the USPTO cancel Registration No. 3.662,484."

"Dated: October 24, 2014                      Steven Westlake, Petitioner"

"Sworn and subscribed to before me this 24th day of October, 2014.

Susan McLain
Notary Public, State of New York
Commission Expires. 11/20/2017"

**B.**     The Plaintiff, Steven Westlake lied under oath to the TTAB:

"Steven Westlake, being duly sworn deposes and duly sworn and states:

1. I am the petitioner in the instant matters before the United States Patent and Trademark Office (USPTO), and I submit this affidavit in support of my instant application for Default Judgment."

"39. Internet Google searches on numerous Police Gazette keywords from 2007 through 2010 revealed no Police Gazette publications, other than the petitioner's after 1977, and no current Police Gazette goods or services of any kind other than the petitioner's."

"42. No Company or individual other than National Police Gazette, LLC, publisher a National Police Gazette period from 1977 through 2009."

"43. On April 8, 2007, content went live on www.PoliceGazette.US. the website of National Police Gazette Enterprises, LLC, and it's trade name William A. Mays."

**C.**    The Plaintiff, Steven Westlake lied under oath to the TTAB:

"BRIEF IN SUPPORT OF JUDGMENT FOR PETITIONER"
"The undersigned attorney for Petitioner, Steven A. Westlake, hereby submits Brief in support of Judgment for the Petitioner to the Honorable Trademark Trial and Appeal Board because the record shows no genuine issue of Material fact and the law entities Petitioner to judgement in his favor."

1. "First use of the mark.
2. In addition, on the same date in 2007, Petitioner began to use the mark NATIONAL POLICE GAZETTE, in various channels of commerce including, but not limited to, printing periodicals, clothing, dishware, wall art, and books.
3. Registration, to date, has failed to provide evidence of the existence of any magazine(s),
    Much less any magazine published prior to the Petitioner's first use of the mark, NATIONAL POLICE GAZETTE, on April 8, 2007
"Lll. On the basis of the uncontested facts the law entities Petitioner to relieve.
14. Petitioner has priority to the mark.
15. There is no genuine issue of material fact."

Dated: October 27, 2014    By: "Respectfully submitted
                                    Mark Levy
                                    HINMAN, HOWARD & KATTELL LLP"
**D**. "The Plaintiff's Attorney, Mark Levy, lied under oath to the TTAB

"ATTORNEY AFFIRMATION"

"Mark Levy, affirming under the penalties of perjury to the New York CPL§ 2106 And FRCP 11, states the following in true:"

"1 I, along with Kevin F. Guyette, represent the petitioner, Stephen A. Westlake in this action for cancellation as I make this affirmation in support of the instant

application for sanctions pursuant to Rule 227 and FRCP 37(b)(2) and seek an order grant default judgement."

"3 As stated in the accompanying Attorney Affirmation by Kevin F. Guyette, Esq., the petitioner has continued to publish the National Police Gazette magazine and there has been no such other activity other than the petitioner's.

"WHEREFORE, I respectfully request that this Board enter an Order Granting Default Judgment on behalf of the Petitioner, Stephen A. Westlake"

"Respectfully submitted
Dated: October 31, 2013                                  By: Mark Levy
HINMAN HOWARD & KATTEL, LLP
Attorney for Petitioner"

**E** The Plaintiff's Attorney, Kevin F. Guyette, lied under oath to the TTAB:

## "ATTORNEY AFFIRMATION"

"Kevin F. Guyette, affirming under the penalties of perjury to New York CPL §2106 and FRCP 11, states the following in true:

I, along with Mark Levy, represent the petitioner, Stephen A. Westlake in this acting for cancellation as I make this affirmation in support of the instant application for sanctions pursuant to Rule 227 FRCP 37(b)(2) and seek an order grant default judgment."

24 Logically, a default judgement is the only sanction which makes sense;

-Striking all or part of respondent's pleadings.
-Refusing to allow respondent to support his claim.
-Prohibiting respondent from introducing evidence (whatever it may be)"

"All result in respondent being unable to present a case, and are therefore Tantamount to a default."

**F** The petitioner, Steven A Westlake and his attorneys, Mark Levy and Kevin F Guyette, to support false statements and lied under oath.

The Petitioner endeavored to obstruct justice to the TTAB and lying to the Honorable Board with knowledge that they would fabricate evidence with false statements to the Board lying under oath – and did thereby deceive, obstruct, and impede the TTAB.

**There is substantial and credible information that the Petitioner and the attorneys lied under oath and committed perjury to the Trademark Trial and Appeal Board (TTAB).**

There is substantial and credible information that Petitioner lied under oath to the TTAB.

### Plaintiff's Testimony

The detail is critical. The detail provides credibility and corroboration to the Plaintiff's testimony. It also demonstrates with clarity that the Plaintiff lied under oath <u>both</u> in their "Brief in Support of Judgement for Petitioner" (filed October 27, 2014) and to the Petitioner's motion for sanctions in the form of default judgment (filed November 1, 2013) for Respondent's failure to file initial disclosures and his delay of these proceedings.

There is substantial and credible information that the Petitioner lied to the TTAB and were abundant and calculating.

The Petitioner lied under oath with an affidavit to purposely "misleading" the TTAB.

**In sum**, based on all of the evidence and considering the Plaintiff's various testimony, there is substantial and credible information that the Plaintiff lied under oath and committed perjury to the TTAB.

> **From: R. Emmett McAuliffe**
> **Sent: Friday, July 16, 2010 3:33 PM**
> **To: saw@policegazette.us**
> **Subject: 2005 Edition**
>
>  Hi Mr. Westlake:
>
>  I see your attorney still has not entered an appearance. Please find enclosed the attached issue from 2005. If this issue is valid, it would seem to me your case goes away and therefore what are we fighting about? But I'd like to know your comments.

Feel free to call and discuss.
Attachments area
Preview attachment National Police Gazette-September 2005.pdf



National Police Gazette-September 2005.pdf

1987—Licensing Agreement for Police Gazette for merchandise such as music boxes, T-shirts, clothing line, shaving mugs, clocks, calendars, posters, etc.

This agreement was entered into between L. Alfred Anish, and Lester A. Euell, the owner of The National Police Gazette from June 19, 1987 to Sept. 29, 1993 and afterward by Anish and Euell during this license agreement which ended on September 10, 2007.

A 20-year license agreement that Lester Euell, signed in September 10, 1987 until September 10, 2007. They both formed four New York corporations as principals in their companies from September 30, 1987 to Sept. 29, 1993:

The National Police Gazette, New York and Melville, New York, Police Gazette Sales Inc., of Farmingdale, N.Y. and The National Police Gazette, Inc., also The Police Gazette Motion Picture Co., Inc. both of East Farmingdale, New York.

It covered the production of Police Gazette-themed collectibles, including apparel, clocks, shaving mugs, calendars, music boxes, published new issues as well as reprints, and posters.

It is very clear and quite obvious what Lester Euell previously did with "The National Police Gazette" trademark and usage of the name. He had separate entities permitted to use the name on a limited basis and scope and also entered into long duration licensing agreements of 20 years in each particular instance to ensure the trademark continued to be used even independent of his own personal efforts.

Now Steven A. Westlake, and both his attorneys are in New York State and they all know the NYS Department of State, Division of Corporations, yet they all lied under oath and committed perjury to the TTAB.

## 1. THE NATIONAL POLICE GAZETTE PUBLISHING COMPANY, INC.
*(September 30, 1987-September 29, 1993)*

2 Park Ave., 19th Floor
New York, New York. 10016.

The National Police Gazette Publishing Company, Inc., Melville, NY Made in U.S.A.

## 2. POLICE GAZETTE SALES INC.
*(June 19, 1989-September 29, 1993)*

55 A Motor Ave.
Farmingdale, New York, 11735

On Long Island they had a 200,000 square foot facility producing Police Gazette memorabilia in Farmingdale.

This facility was producing Police Gazette clocks and music boxes, posters, and reprints of various and sundry things like t-shirts and calendars, etc.

## 3. THE NATIONAL POLICE GAZETTE, INC.
*(July 13, 1994-September 23, 1998)*

125 Sherwood Ave.
East Farmingdale, New York, 11735

## 4. THE POLICE GAZETTE MOTION PICTURE CO., INC.
*(June 13, 1994-September 23, 1998)*

125 Sherwood Ave.
East Farmingdale, New York, 11735

## CONCLUSION

The Trademark Trial and Appeal Board did the proper action correctly by principles in denying the Appellant's motions.

The Appellee/Registrant respectfully requests this Honorable Court to terminate the Appellant's cancellation.

Dated: February 25th 2016.

Edgar Alexander Barrera
22159 Ladera Street.
Grand Terrace, California 92313

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of February, 2016. And hereby certify mailed the documents by U.S. mail on the parties listed below as indicated below, and that the foregoing by United States Postal Service (USPS).

Director of the U.S Patent and Trademark Office
Office of the Solicitor
Mail Stop 8, P.O Box 1450
Alexandria, VA 22313-1450

Mark Levy, Esq.
Attorney for Appellant
HINMAN, HOWARD & LATTELL, LLP
80 Exchange Street
P.O BOX 5250
Binghamton

February,25th 2016

Edgar Alexander Barrera
22159 Ladera Street.
Grand Terrace, California 92313

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**Trademark Trial and Appeal Board**
**P.O. Box 1451**
**Alexandria, VA 22313-1451**
General Contact Number: 571-272-8500

wbc

RECEIVED

MAR 07 2016

United States Court of Appeals
For The Federal Circuit

Mailed: August 14, 2015

Opposition No. 92052260

Steven Westlake

v.

Edgar Alexander Barrera

**Before Ritchie, Wolfson and Masiello,
Administrative Trademark Judges.**

**By the Board:**

Respondent owns a registration for the mark THE NATIONAL POLICE GAZETTE THE LEADING ILLUSTRATED SPORTING JOURNAL IN AMERICA and design, depicted below:



for "magazines in the field of current events and sports," in International Class 16 and "publication of magazines; newspaper publication; newspaper publishing," in International Class 41.[1] In his amended petition to cancel filed September 15, 2010, Petitioner set forth claims of fraud and false

---

[1] Registration No. 3662484 issued August 4, 2009 claiming a date of first use anywhere and in commerce of January 2, 1977 for both classes.

suggestion of a connection under Section 2(a).[2] In his amended answer, Respondent denied the salient allegations in the amended petition to cancel.

As last reset, Petitioner's testimony period was scheduled to close on July 29, 2014, and that period was not extended. During his testimony period, Petitioner failed to introduce any evidence or testimony. In the Board's January 28, 2015 order, the Board allowed Petitioner until Februrary 12, 2015 to show cause why judgment should not be rendered against him for failure to prosecute this case. On February 18, 2015, Petitioner filed a combined motion to reopen his time to respond to the Board's show cause order, together with his combined response to the show cause order and motion to reopen his testimony period.[3] Respondent opposes the combined motions and submitted arguments against Petitioner's response to the show cause order.[4] The Board has considered the parties' submissions and presumes the parties' familiarity with the factual bases for the motions, and does not recount them here, except as necessary to explain the Board's decision.

---

[2] The original petition to cancel was filed March 29, 2010. The Board's September 24, 2010 order accepted the amended petition to cancel as Petitioner's operative pleading.

[3] Inasmuch as Petitioner argues that he "should be granted this one extension of time to submit evidence," the Board construes this language as a motion to reopen his testimony period. *Response* at. p. 8.

[4] Respondent filed "responses" to the Board's January 28, 2015 show cause order on February 12, 2015, even though no response from Respondent was called for.

Respondent also filed papers March 27, 2015 and April 3, 2015 alleging, *inter alia*, that Petitioner's February 18, 2015 combined motion to reopen and response to the Board's show cause order was not properly served on Respondent. The Board's April 9, 2015 order served those papers on Respondent allowing Respondent additional time to file a response. Respondent filed a response on April 23, 2015 and the same response, this time notarized, again on April 26, 2015 (in duplicate).

*Motion to Reopen*

The Board first addresses the motion to reopen Petitioner's time to file a response to the Board's show cause order. Petitioner, supported by affidavits from his attorney and paralegal, alleges that Petitioner's attorney, Mr. Mark Levy, prepared a response prior to the deadline and sent it to his paralegal, Ms. Amy Manzer on February 12, 2015 for filing with the Board; that Mr. Levy resides in Florida while Ms. Manzer works in the firm's main office in Birmingham, New York; that unbeknownst to Mr. Levy, Ms. Manzer was involved in a serious automobile accident on February 8, 2015 with resulting injuries and a doctor's visit on February 10, 2015; and that because of the accident, Ms. Manzer was unable to file the response to the show cause order by the Board's February 12, 2015 deadline.

For the Board to reopen Petitioner's time to respond to the Board's show cause order, Petitioner must establish that his failure to act in a timely manner was the result of excusable neglect. *See* Fed. R. Civ. P. 6(b)(1)(B); TBMP § 509.01(b)(1). In *Pioneer Investment Services Co. v. Brunswick Associates L.P.*, 507 U.S. 380, 395 (1993), as adopted by the Board in *Pumpkin, Ltd. v. The Seed Corps*, 43 USPQ2d 1582 (TTAB 1997), the Supreme Court held that the determination of whether a party's neglect is excusable is:

> at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include... [1] the danger of prejudice to the [nonmovant], [2] the length of the delay and its potential impact on judicial

3

proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith.

We consider Petitioner's motion to reopen time to respond to the Board's show cause order in light of these factors. Regarding the first *Pioneer* factor, there does not appear to be any prejudice to Respondent. Prejudice to the nonmovant as contemplated under the first *Pioneer* factor must be more than mere inconvenience or delay. Prejudice to the nonmovant is prejudice to the nonmovant's ability to litigate the case. *See Pumpkin Ltd. v. The Seed Corps,* 43 USPQ2d at 1587 (*citing Pratt v. Philbrook,* 109 F.3d 18 (1st Cir. 1997)); TBMP § 509.01(b)(1).

Regarding the second *Pioneer* factor, Petitioner filed the motion to reopen six days after the deadline for his response. Accordingly, the impact of the delay upon this proceeding is insignificant and weighs in favor of a finding of excusable neglect.

Turning to the third *Pioneer* factor, the Board finds that Petitioner's failure to timely act was caused by his paralegal's automobile accident and resulting injuries. Ms. Manzer's condition apparently rendered her unable to file Petitioner's already-prepared response. Accordingly, this factor weighs in favor of a finding of excusable neglect. Finally, regarding the fourth *Pioneer* factor, there is no evidence of bad faith on Petitioner's part.

4

In view thereof, the motion to reopen Petitioner's time to respond to the Board's show cause order is **granted**. The Board now considers Petitioner's response to the Board's show cause order.

*Response to Show Cause Order and Motion to Reopen Testimony*

Petitioner alleges, *inter alia*, that the Board should set aside its show cause order for failure to prosecute because the proceeding has languished for five years due to Respondent's various requests for extensions of time based upon Respondent's alleged need to retain counsel and to recover from various medical emergencies; that allowing the parties to now submit evidence will allow the Board to determine the case on its merits and thus, will not prejudice Respondent's ability to defend the claims; that this delay is slight; that Petitioner failed to submit evidence or testimony because of "the difficulty [he] has endured to continue publishing *The National Police Gazette* on a monthly basis while simultaneously remaining abreast of and responding to Respondent's numerous requests for extensions and stays," *Response* at p. 5; that given the totality of factors, "equity favors permitting Petitioner to reopen these proceedings," *id*. at p. 6; and that Petitioner has always acted in good faith.

The Trademark Rules clearly state that no testimony shall be taken except during the times assigned, unless by stipulation of the parties approved by the Board, or upon motion granted by the Board, or by order of the Board. Trademark Rule 2.121(a)(1); *see also* TBMP § 705 and cases cited

5

therein. In order to discharge the Board's show cause order for failure to prosecute his case, Petitioner must demonstrate "good and sufficient cause" why judgment should not be entered against it. *Cf.* Trademark Rule 2.132(a). The Board has previously held that the "good and sufficient cause" standard set out in Trademark Rule 2.132(a) is equivalent to the "excusable neglect" standard applied to a motion to reopen. *Old Nutfield Brewing Co. v. Hudson Valley Brewing Co.*, 65 USPQ2d 1701, 1702 (TTAB 2002). As previously discussed, in analyzing excusable neglect, the Board relies on the Supreme Court's discussion in *Pioneer Investment Services Co.*, 507 U.S. 380.

With regard to the danger of prejudice to the Respondent, we note that the mere passage of time is generally not considered prejudicial, absent the presence of other facts, such as the loss of potential witnesses, which has not been alleged here. *Pumpkin*, 43 USPQ2d at 1587. Although the delay to Respondent may not be prejudicial, the Board finds the delay occasioned by Petitioner's failure to submit evidence in support of his case is substantial. Petitioner's trial period expired July 29, 2014 yet he did not file his motion to reopen testimony until the scheduled testimony periods for both parties expired and only after the Board issued its show cause order on January 28, 2015. Further, while there is no evidence Petitioner acted in bad faith, Petitioner has offered no reasons why he was not diligent in prosecuting his case, except to say it was difficult to publish *The National Police Gazette* on a

6

monthly basis and respond to the various motions filed by Respondent.[5] *See Pumpkin, Ltd.*, 43 USPQ2d at 1586, n.7 (In undertaking the Pioneer analysis, several courts have stated that the third *Pioneer* factor, namely the reason for the delay and whether it was within the reasonable control of the movant, might be considered the most important factor). We find the reason for the delay was within Petitioner's control and this factor weighs strongly in favor of Respondent.

Considering the circumstances herein, the Board finds that Petitioner's failure to take testimony or offer evidence was not the result of excusable neglect. Accordingly, Petitioner's motion to reopen his testimony period is **denied**.

Inasmuch as Petitioner has not submitted any record evidence or testimony in support of his case, the Board enters judgment in favor of Respondent. The cancellation is **dismissed**.

---

[5] Although Petitioner argues that Respondent occasioned many delays in this proceeding, we note that it was Petitioner who brought the proceeding. Respondent's delays are no excuse for Petitioner's failure to prosecute.

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE


Opposition No.      :      92052260

Petitioner          :      Steven A. Westlake

Mark                :      THE NATIONAL POLICE GAZETTE THE LEADING
                    :      ILLUSTRATED SPORTING JOURNAL IN AMERICA and :
                           Design

Customer No.        :      41245


Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450


<u>NOTICE OF APPEAL TO THE UNITED STATES</u>
<u>COURT OF APPEALS FOR THE FEDERAL CIRCUIT</u>


   Steven Westlake, petitioner in the above action ("Petitioner"), hereby provides
the USPTO Director this Notice of Appeal to the United States Court of Appeals for the
Federal Circuit and petitions such court for review of the Decision of the Trademark Trial
and Appeal Board, Opposition No. 92052260, entered on August 14, 2015.

   The Director is authorized to charge Deposit Account No. 50-3721 for any fees
that are required.


                                    Respectfully submitted,

                                    HINMAN, HOWARD & KATTELL, LLP


Dated:  October 1, 2015             By:  _____
                                         Mark Levy
                                         Attorney for Petitioner
                                         80 Exchange Street
                                         P.O. Box 5250
                                         Binghamton, NY 13901
                                         Phone: (607) 231-6830

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

ESTTA Tracking number: **ESTTA664807**

Filing date: **04/03/2015**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| | |
|---|---|
| Proceeding | 92052260 |
| Party | Defendant<br>Edgar Alexander Barrera |
| Correspondence Address | EDGAR ALEXANDER BARRERA<br>BY MELISSA BARRERA POWER OF ATTORNEY<br>22159 LADERA STREET<br>GRAND TERRACE, CA 92313<br>UNITED STATES<br>axlellism@netbusiness.com |
| Submission | Other Motions/Papers |
| Filer's Name | Edgar Alexander Barrera |
| Filer's e-mail | axlellism@netbusiness.com |
| Signature | /edgaralexanderbarrera/ |
| Date | 04/03/2015 |
| Attachments | trademark april 2015.pdf(226997 bytes ) |

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

Cancellation No. 92/052,260
(Serial No. 77/378,015)

## RESPONDENT'S RESPONSE TO OPPOSITION
## OF THE PETITIONER'S MOTION TO ACCEPT DELAYED
## RESPONSE TO THE ORDER TO SHOW CAUSE

The Petitioner has not yet sent his response to the Respondent via First Class Mail, postage prepaid, and also it has not sent to my correct address either. I have been constantly waited for it but nothing from the Plaintiff to my correct one: Edgar Alexander Barrera, Respondent, 22159 Ladera Street, Grand Terrace, CA 92313. The Petitioner did not send it properly anyway and thus it should be voided.

The undersigned by **Edgar Alexander Barrera**, the Respondent in this particular matter:

### "AFFIDAVIT OF PETITIONER'S ATTORNEY"

"Mark Levy, attorney for the Petitioner, affirms the following facts."

'1. On February 12, 2015, I completed a Response to the Order to Show Cause dated January 28, 2015 and forwarded same to my paralegal, Ms. Amy Manzer, by email. I expect the completed response would be filing that evening or, at the latest, the morning of February 13, 2015."

"3. In the normal course of business, I often correspond with Ms. Manzer by email."

This is what the Petitioner's Attorney is stating in his own exact words on "Page 1 of 3."

The Petitioner's Attorney correctly states he had to give a Response to the Order to Show Cause dated January 28, 2015.

The Board stated on that particular date: "In view thereof, Petitioner is allowed fifteen days from the date of this order to show cause why judgment should not be rendered against him for failure in to prosecute this case, failing which judgment may be entered against Petitioner." "Mailed: January 28, 2015"

Wednesday, January 28, 2015 "Petitioner is allowed fifteen days from the date of entry this order" which is allowed until Wednesday, February 11, 2015. Very simple, but the Petitioner's Attorney states he will respond on February 12, 2015 a day later. And states he expect the

complete response would be filing that evening or, at the latest, the morning of February 13, 2015. Which is two days after the allowed fifteen days of this order.

The "Affidavit of Petitioner's Attorney Paralegal, Amy Manzer" states she: "was in a severe accident on February 8, 2015, deploying her air bags, injuring her chest and back, and totaling the car. Ms. Manzer visited a physician at the local hospital to receive medical treatment for her back on February 10, 2015. If she was injured why did she wait three days to receive medical treatment. And all of this happened before the evening of February 12, 2015 or the morning of February 13, 2015 which is two days after the allowed fifteen days of the Board order. By in their own words state it was not going to be sent in the correct time before her accident.

Likewise the Petitioner's Attorney also states: ""In the normal course of business, I often correspond with Ms. Manzer by email." He would have then known this already had happened since he corresponds in the normal cause by email daily with her. The whole story does not add up at all about this particular matter.

Wendy Boldt Cohen, Interlocutory Attorney sent:
"Mailed: January 28, 2015"

"Notwithstanding the foregoing, the Board notes that the time for Petitioner to take testimony has expired2 and the record demonstrates that Petitioner has failed to submit any evidence or take any testimony during its assigned testimony period. Cf. Trademark Rule 2.132 and TBMP § 534. In view thereof, Petitioner is allowed fifteen days from the date of this order to show cause why judgment should not be rendered against him for failure to prosecute this case, failing which judgment may be entered against Petitioner. Id. Proceedings are otherwise suspended. Any paper filed during the pendency of this show cause order which is not relevant thereto will be given no consideration. 2 Petitioner's trial period ended July 29, 2014."

I respectfully request this Honorable Board as the interest of justice can be served.

Respectfully submitted by:

Edgar Alexander Barrera, Respondent
22159 Ladera Street
Grand Terrace, CA 92313

Dated: April 3, 2015

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

ESTTA Tracking number:   **ESTTA643532**

Filing date:   **12/10/2014**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| | |
|---|---|
| Proceeding | 92052260 |
| Party | Defendant<br>Edgar Alexander Barrera |
| Correspondence<br>Address | EDGAR ALEXANDER BARRERA<br>BY MELISSA BARRERA POWER OF ATTORNEY<br>22159 LADERA STREET<br>GRAND TERRACE, CA 92313<br>UNITED STATES<br>axlellism@netbusiness.com |
| Submission | Other Motions/Papers |
| Filer's Name | Edgar Alexander Barrera |
| Filer's e-mail | Axlellism@netbusiness.com |
| Signature | /EdgarAlexanderBarrera/ |
| Date | 12/10/2014 |
| Attachments | policegazettepdf001.pdf(3399007 bytes )<br>policegazettepdf002.pdf(3434598 bytes )<br>policegazettepdf003.pdf(2670470 bytes )<br>policegazettepdf004.pdf(5804984 bytes )<br>policegazettepdf005.pdf(2382351 bytes ) |

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

STEPHEN A. WESTLAKE,                    )
                                        )
        Petitioner,                     )        Cancellation No. 92/052,260
                                        )        (Serial No. 77/378,015)
                                        )
EDGAR ALEXANDER BARRERA                 )
                                        )
        Respondent.                     )

## RESPONDENT'S RESPONSE TO OPPOSITION

### MOTION ON BEHALF OF THE RESPONDENT
### TO DENY BRIEF IN SUPPORT OF JUDGMENT FOR PETITIONER

I am Edgar Alexander Barrera, the Respondent in this matter, being duly sworn deposed and states:

The Respondent, Edgar Alexander Barrera, (hereinafter the "Respondent") respectfully requests this Honorable Board to consider this motion as the interest of justice can be served.

The Petitioner and his attorneys have used subterfuge. The Plaintiff, Steven A. Westlake has consciously deliberately lied: he fabricated "evidence." False statements either were made recklessly or with knowledge of their falsity. Plaintiff committed perjury to the Trademark Trial and Appeal Board (TTAB).

COMES NOW, "Respondent's Response to Opposition" and files this Motion on Behalf of the Respondent to Deny Brief in Support of Judgment for Petitioner and also files as well another Motion to dismiss the Plaintiff's Petition for Cancellation and Petitioners Amended Petition to Cancel.

Motion for Judgment on behalf of the Respondent against the Plaintiff's failure to prosecute or prove case and an Order granting a Default Judgment against the Plaintiff, Steven A. Westlake.

For the foregoing reasons, I submit that Plaintiff's appearance in this litigation has completely been a sham; that he has never had a good-faith intention to participate.

The Plaintiff's claims are total shams and everything has been a figment of his crazed imagination, absolutely committed perjury.

The Petitioner has "unclean hands."

The "Dirty Hands Doctrine" refers to an equitable design available to a defendant against the plaintiff.

It is an affirmative defense that the defendant may claim the plaintiff has "unclean hands".

Plaintiff has acted in bad faith or in an unethical manner.

The Respondent has been harmed by this Petitioner.

WHEREFORE, I respectfully request that this Board enter an Order granting Judgment on behalf of the Respondent, Edgar Alexander Barrera.

<u>Plaintiff was sent the "National Police Gazette-September 2005.pdf"</u>

Plaintiff
           **Name:** Steven Westlake
**Correspondent:** Steven Westlake
                   PO Box 372
                   Binghamton, NY 13902
                   UNITED STATES
                   saw@policegazette.us

July 16, 2010 at 4:35 PM EDT, to the Plaintiff, Steven A. Westlake, sent to his e-mail: saw@policegazette.us (SAW initials for Steven A. Westlake).

Riezman Berger P.C., R. Emmett McAuliffe, Attorney at Law, Chair, Intellectual Property and Media Law Practice Group, St. Louis (Clayton), Missouri 63105, from: "R. Emmett McAuliffe" rem@riezmanberger.com to: saw@policegazette.us, Subject: **2005 Edition**

"Hi Mr. Westlake:

I see your attorney still has not entered an appearance. Please find enclosure the attached issue from 2005. If this issue is valid, it would seem to me your case goes away and therefore what are we fighting about? But I'd like to know your comments.

Feel to call and discuss."

"**National Police Gazette-September 2005.pdf**
294-4K"                                    See Exhibits A and B.

From "R. Emmett McAuliffe" rem@riezmanberger.com to: Les Euell <leseuell@gmail.com> and sent a copy to the Respondent:

"Subject: nothing from Westlake"                              See Exhibit C.

### Defendant's 30-day Trial Period Ends September 27, 2014

Defendant's 30-day Trial Period Ends and Motion for Judgment on Behalf of the Respondent Against Plaintiff's Failure to Prosecute or Prove Case and an Order Granting Default Judgment, sent September 27, 2014 to the Plaintiff.

Lester A. Euell was the owner and publisher of the Police Gazette from 1977 until 2005. The Respondent is the Godson to Lester Euell, owner of Franklin Publishing Company that published the Police Gazette in 2005.      See Exhibit D.

Respondent became the owner and publisher of the Police Gazette in 2006.
                                                                See Exhibit E.

### Police Gazette Collectibles 20-year License Agreement, 1987-2007

Also a 20-year license agreement that Lester Euell, my Godfather, signed in September 10, 1987 with a new corporation of which he was part owner, Police Gazette Sales Inc., of Farmingdale, N.Y.

It covered the production of Police Gazette-themed collectibles, including apparel, clocks, shaving mugs, calendars, music boxes, published new issues as well as reprints, and posters.                        See Exhibit F.

This agreement was entered into between L. Alfred Anish, the principal of Police Gazette Sales Inc., and Lester Euell,  L. Alfred Anish, Lester A. Euell, and Police Gazette Sales Inc., a New York Corporation from June 19, 1989 to Sept. 29, 1993.                                                    See Exhibit G.

And afterward by Anish and Euell, with William B. Dana Company (principal of Lester A. Euell, a New York: Domestic Business Corporation, Initial DOS Filing Date: May 31, 1894 and Inactive-Dissolution by Proclamation/ Annulment of Authority (October 28, 2009), during this license agreement which ended on September 10, 2007.                                      See Exhibit H.

It's strange that Plaintiff launched his raid on our trademark in 2007.

It is very clear and quite obvious what my Godfather, Lester Euell previously did with "The National Police Gazette" trademark and usage of the name. He had separate entities permitted to use the name on a limited basis and scope and also entered into long duration licensing agreements of 20 years.

Respondent has never entered into any agreement or license of any kind whatsoever with the Plaintiff, Stephen A. Westlake.

Respondent admits that the word mark and logo design claimed by Respondent is identical to Petitioner's mark, this causes Plaintiff to be infringing on Respondent's mark. Since Respondent's use of the mark in question has priority over Plaintiff's mark, this causes Plaintiff to be infringing on Respondent's mark.

The Plaintiff is damaging the Respondent's trademark, good will and business.

It is quite obvious we own the goodwill and own the trademark. The Plaintiff has never owned the goodwill, any rights, any title and interest.

The complete fabrication is that the Plaintiff has ever owned the Respondent's trademark and never has. Everything by the Plaintiff is completely deceptive and totally illegal.

"Copyright 2007 by William A. Mays, Proprietor" Only copyright notice and not about the National Police Gazette in the Plaintiff's website during 2007 to 2010.
See Exhibit I.

## The Respondent to the USPTO in January 23, 2008

The Respondent sent the U.S. Patent and Trademark Office on January 23, 2008 with the application, four specimens and a drawing.        See Exhibits J and K.

The Plaintiff claims to have started on April 8, 2007. The Plaintiff's complete ruse to the TTAB and made up their fabricated "evidence" deliberately that "the application including two digital images as specimens, which Registrant alleged were magazine covers." And the Plaintiff can't even tell the TTAB the amount specimens and stating it to be "two" when in reality it was four specimens in their false statements.

Sent a signal that the Plaintiff was calculating to mislead the TTAB by a statement that was carefully crafted. The Plaintiff thought he was shrewdly in to under evade the real truth in this matter.

Which were false statements either were made recklessly or with knowledge of their falsity and it the Plaintiff state began to use the mark, National Police Gazette what would make any difference because of the actual dates sent to the U. S. Patent and Trademark Office to the application were valid.

The Plaintiff, Steven Westlake lied under oath to the TTAB:

"6. On January 23, 2008, Registrant Edgar Alexander Barrera applied to the USPTO to register the National Police Gazette mark used as evidence a pair of digitally created images that supposedly represented magazine covers."

The Plaintiff's Attorney, Mark Levy lied under oath to the TTAB:

"II. The record shows the absence of any genuine issue of material fact."

"4.   Nine months after Petitioner's first use of the mark (i.e., on January 23, 2008), Registrant an application to register NATIONAL POLICE GAZETTE THE LEADING ILLUSTRATED SPORTING JOURNAL IN AMERICA in the U.S Patent and Trademark Office, the application including two digital images as specimens, which Registrant alleged were magazine covers.

### Plaintiff was Not Register as a DBA in NYS until 2009

Stephen A. Westlake did not register as a DBA until October 16, 2009. All this time he used the name William A. Mays, Proprietor so he could conceal his identity in the meantime and showed Mays as the Proprietor all the time and still does on the site. That is very deceptive. This means he was using an alias from 2007 until October 18, 2009. And was not registered in New York State before that which was illegally during that time before.

Broome County.com Document Number: 2009000450355
Recorded Date/Time: 10/18/2008  15:59:34  Cert. Date: 10/18/2008.

See Exhibit L.

NYS Department of State

Division of Corporations

Current Entity Name: NATIONAL POLICE GAZETTE ENTERPRISES, LLC

Name History

| Filing Date | Name Type | Entity Name | |
|-------------|-----------|-------------|---|
| MAR 26, 2010 | Actual | NATIONAL POLICE GAZETTE ENTERPRISES, LLC | |
| JUL 23, 2003 | Actual | WESTLAKE PROPERTIES, LLC | See Exhibit M. |

### Petitioner's Motion for Default Judgment, November 1, 2013

January 16, 2014, the Honorable Board, Wendy Boldt Cohen, interlocutory Attorney, ruled against the Petitioner's motion for sanctions in the form of default judgment (filed November 1, 2013) for Respondent's failure to file initial disclosures and his delay of these proceedings: "Accordingly, petitioner's motion for sanctions in the form of default judgment is DENIED."

### Petitioner's Proceedings with the Board

In this entire matter the Petitioner's Petition and Amended Petitioner to Cancel

one shred that the Plaintiff has not shown any Printing Periodicals, Clothing, Dishware, Wall Art or Books to the TTAB. Because from 2007 until 2008 did nothing during this time whatsoever.

Plaintiff has not given any Expert Disclosures, Discovery Closed, No Pretrial Disclosures Closed, No 30-day Trial Period Ended, Plaintiff's Rebuttal Disclosures, Plaintiff's 15-day Rebuttal Period Ended. Nothing was in any of these by the Plaintiff.

| Expert Disclosures Due | 3/ 31/ 2014 |
|---|---|
| Discovery Closes | 4/ 30/ 2014 |
| Plaintiff's Pretrial Disclosures | 6/ 14/ 2014 |
| Plaintiff's 30-day Trial Period Ends | 7/ 29/ 2014 |
| Plaintiff's Rebuttal Disclosures | 10/12/2014 |
| Plaintiff's 15-day Rebuttal Period Ends | 11/11/2014 |

In each instance, a copy of the transcript of testimony together with copies of documentary exhibits must be served on the adverse party within thirty days after completion of the taking of testimony. Trademark Rule 2.125, there were no transcript of testimony together documentary exhibits. As there were none whatsoever.

Briefs shall be filed in accordance with Trademark Rules 2.128 (a) and (b). An oral hearing will be set only upon request filed as provided by Trademark Rule 2.129. No briefs or an oral hearing or requested, whatsoever.

Petitioner:    Steven A. Westlake,
               National Police Gazette Enterprise, LLC
               d/b/a William A. Mays
               P. O. Box 372
               Binghamton, New York 13902

"William A. Mays" is not registered as being a DBA, Fictitious Business Name (FBN) in New York State, which is required to be in NYC if you use a business name.

Petitioner's Amended Petition to Cancel   September 15, 2010
Petition for Cancellation ESTTA TRACKING number: ESTTA339488
Filing date: March 3, 2010.

Grounds for Cancellation:
Deceptiveness - Trademark Act section 2 (a)
False suggestion of a connection - Trademark Act section 2 (a)
Priority and likelihood of confusion - Trademark Act section 2 (d)

What is unbelievable are the so-called Grounds for cancellation the Petitioner,

Westlake is using exactly what he is totally doing himself, and it is said: —
"When you point one finger, there are three fingers pointing back to you."

## Trademark Class 16: Paper Goods

Class 16 includes paper, cardboard and goods made from these materials.
Class 16 is one of 45 classes used by the U.S. Patent and Trademark Office
(USPTO) when grouping products or services.

The Petitioner first printed periodical issue was published May 1, 2011. Nothing
was issued any periodical before then. Likewise no books were printing before
March 21, 2012. A book called: "The Plot To Assassinate Barack Obama," by
William A. Mays, Published by The Police Gazette House. William A. Mays is not
real, phony and completely bogus.                              Exhibits N and O.

Nobody in their right mind would publish something so bizarre.

### The Petitioner "The Plot To Assassinate Barack Obama" Book

Threatening the President of the United States is a class D felony under United
States Code Title 18, Section 871. It consists of knowingly and willfully mailing or
otherwise making "any threat to take the life of, to kidnap, or to inflict bodily harm
upon the President of the United States." The United States Secret Service
investigates suspected violations of this law and monitors those who threatening
the President.

The U.S. Court of Appeals for the Seventh Circuit held that a threat was
knowingly made if the maker comprehended the meaning of the words uttered by
him. It was willingly made, if in addition to comprehending the meaning of his
words, the maker voluntarily and intentionally uttered them as a declaration of
apparent determination to carry them into execution.

According to the U.S. Attorney's Manual, "Of the individuals who come to the
Secret Service's attention as creating a possible danger to one of their
protectees, approximately 75 percent are mentally ill."

### Plaintiff's Site was Only a "Homage" to the Police Gazette, 2007-2010

As for the "William A. Mays, Proprietor" needs to characterize his Internet site as
a "fan site" or "tribute site." The Internet is loaded with places where people can
share their enthusiasm for sport teams, entertainers, movies, television shows,
comic books, games, or virtually anything that's part of American popular culture.

These sites have occasionally gotten in trouble for unauthorized use of
copyrighted material. But the Internet is still a fairly wild and unregulated place,

and Hollywood certainly feeds off the publicity

Precisely because the "William A. Mays, Proprietor" for all practical purposes declared it to be a "fan site" or "tribute site."

Significantly, "William A. Mays, Proprietor" characterized his site as a "homage" to the Police Gazette, without any claims to ownership. Here's the full text, posted to the front page of his Internet site:

"As American as baseball, gunfire, apple pie, drugs, George Washington, Jesse James, and secret sex, the National Police Gazette informed, shocked, outraged and entertained its way into the hearts of millions for over 130 years. This website is an homage to the National Police Gazette in its coverage of current events, as well as an archive of historical materials from the original publication. Current items can be found in Today's News, Eccentric Tantrums, and the Sports Page, while historical articles and illustrations from the original National Police Gazette can be found in The Morgue."

But certainly by 2010, the Plaintiff had completely changed his tune and began making ownership claims, even beyond his action against us. This included the bold assertion: "America's Original Tabloid™ Covering crime, sports, celebrities, and all things sensational since 1845."

The Plaintiff subsequently added after our trademark registration: "Legal and contact information" as well as "Welcome to National Police Gazette Enterprises, LLC, a company dedicated to the preservation, promotion, and continuation of the National Police Gazette."

In view of these facts, the Respondent believe that we can make a meaningful claim that "William A. Mays, Proprietor," started his online venture as nothing more than a fan site or tribute site.

The most troubling is the Plaintiff's who raise their hands, take an oath to tell the truth and then fail to do that. An analogy might be made to termites that get inside your house. Nobody sees it, nobody knows about it until the house collapses around you."

The Respondent will bring the Plaintiff "back to the mark, to flush out the whole truth."

The Plaintiff was trying to pull the wool over their eyes of the Honorable Trademark Trial and Appeal Board, and only will end up fooling their self.

Plaintiff "Brief in Support of Judgment" has consciously deliberate lied: he fabricated "evidence":

I.　First use of the mark.1, 2 and 3 are false statements.
II.　The record shows the absence of any genuine issue of material fact.
4, 7, 8, 9, 10, 11, 12 are false statements. III.　On the basis of the uncontested
facts, the law entities Petitioner to relieve. 13, 14, 15, 16, 17 are false
statements. Steven Westlake, being duly sworn deposes and states:
1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 are false statements and fabricated
"evidence."

### Introduction

There is substantial and credible information that the Plaintiff committed acts
under oath before the United States Patent Trademark Office, and submitted
affidavits in support of their "Brief in Support of Judgment for Petitioner."

### Evidence that Plaintiff Lied Under Oath to the TTAB

The Respondent hereby submits substantial and credible information that the
Plaintiff and his Attorneys obstructed justice by lying under oath and concealing
evidence. The Plaintiff and his Attorneys lied under oath and obstructed justice
before the United States Patent Trademark Office (USPTO), and submitted
affidavits in support of their "Brief in Support of Judgment for Petitioner."

### Plaintiff's Statements Under Oath to the TTAB

There is substantial and credible information supporting the following five
possible grounds (A to F) for concealing evidence:

A.　The Plaintiff, Steven Westlake lied under oath to TTAB:

"Steven Westlake, being sworn deposes and states:

1. I am the petitioner in the instant matter before the United States Patent
   and Trademark Office (USPTO), and I submit this affidavit in support of
   the Brief in Support of Judgment for Petitioner, concurrently submitted.

2. On April 7, 2007, no other party was used the National Police Gazette
   mark in commerce in any channel and no periodical under that name
   and/or mark had been published since January, 1977."

"15. For the foregoing reasons, I submit that Registration's appearance in
this litigation has completely been a sham; that he has never had a good-
faith intention to participate. He is merely prolonging this proceeding so
that he can help his name attached to a notable trademark. Therefore to a
notable trademark. Therefore, I respectfully ask that the USPTO cancel

Registration No. 3.662,484."

"Dated: October 24, 2014                    Steven Westlake, Petitioner"

"Sworn and subscribed to before me this 24th day of October, 2014

Susan McLain
Notary Public, State of New York
Commission Expires 11/20/2017"

B.  The Plaintiff, Steven Westlake lied under oath to the TTAB:

"Steven Westlake, being duly sworn deposes and duly sworn and states:

1. I am the petitioner in the instant matters before the United States Patent
   and Trademark Office (USPTO), and I submit this affidavit in support of
   my instant application for Default Judgment."

"39. Internet Google searches on numerous Police Gazette keywords from
2007 through 2010 revealed no Police Gazette publications, other than the
petitioner's after 1977, and no current Police Gazette goods or services of
any kind other than the petitioner's."

"42.  No Company or individual other than National Police Gazette, LLC,
publisher a National Police Gazette periodical from 1977 through 2009."

"43. On April 8, 2007, content went live on _    _?ⁿ    ⁻¹⁻    US, the
website of National Police Gazette Enterprises, LLC, and its trade name
William A. Mays."

C.  The Plaintiff's Attorney, Mark Levy, lied under oath to the TTAB:

"BRIEF IN SUPPORT OF JUDGMENT FOR PETITIONER"

"The undersigned attorney for Petitioner, Steven A. Westlake, hereby submits
this Brief in Support of Judgment for Petitioner to the Honorable Trademark
Trial and Appeal Board because the record shows no genuine issue of
material fact and the law entities Petitioner to judgment in his favor."

"1. First use of the mark.

"2. In addition, on the same date in 2007, Petitioner began to use the mark,
NATIONAL POLICE GAZETTE, in various channels of commerce including,
but not limited to, printing periodicals, clothing, dishware, wall art, and books.

"3. Registration, to date, has failed to provide evidence of the existence of any

magazine(s), much less any magazine published prior to the Petitioner's first use of the mark, NATIONAL POLICE GAZETTE, on April 8, 2007."

"III. On the basis of the uncontested facts the law entities Petitioner to relieve.

14. Petitioner has priority to the mark.
15. There is no genuine issue of material fact."

"Respectfully submitted,
Dated: October 27, 2014       By:   Mark Levy
                                    HINMAN, HOWARD & KATTELL LLP"

D. The Plaintiff's Attorney, Mark Levy, lied under oath to the TTAB:

## "ATTORNEY AFFIRMATION"

"Mark Levy, affirming under the penalties of perjury to New York CPL§ 2106 and FRCP 11, states the following in true:"

"1. I, along with Kevin F. Guyette, represent the petitioner, Stephen A. Westlake in this action for cancellation as I make this affirmation in support of the instant application for sanctions pursuant to Rule 227 and FRCP 37(b)(2) and seek an order grant default judgment."

"3. As stated in the accompanying Attorney Affirmation by Kevin F. Guyette, Esq., the petitioner has continued to publish the National Police Gazette magazine and there has been no such other activity other than the petitioner's.

"WHEREFORE, I respectfully request that this Board enter an Order Granting Default Judgment on behalf of the Petitioner, Stephen A. Westlake."

"Respectfully submitted
Dated: October 31, 2013       By:   Mark Levy
                                    HINMAN HOWARD & KATTEL, LLP
                                    Attorney for Petitioner"

E. The Plaintiff's Attorney, Kevin F. Guyette, lied under oath to the TTAB:

## "ATTORNEY AFFIRMATION"

"Kevin F. Guyette, affirming under the penalties of perjury to New York CPL §2106 and FRCP 11, states the following in true:

I, along with Mark Levy, represent the petitioner, Stephen A. Westlake in this action for cancellation as I make this affirmation in support of the instant

application for sanctions pursuant to Rule 227 and FRCP 37(b)(2) and seek an order grant default judgment."

"24. Logically, a default judgment is the only sanction which makes sense;

- Striking all or part of respondent's pleadings
- Refusing to allow respondent to support his claim.
- Prohibiting respondent from introducing evidence (whatever it may be)"

"All result in respondent being unable to present a case, and are therefore Tantamount to a default."

F. The Petitioner, Steven A. Westlake and his attorneys, Mark Levy and Kevin F. Guyette, to support false statements and lied under oath.

The Petitioner endeavored to obstruct justice to the TTAB and lying to the Honorable Board with knowledge that they would fabricate evidence with false statements to the Board lying under oath -- and did thereby deceive, obstruct, and impede the TTAB.

There is substantial and credible information that the Petitioner and the attorneys lied under oath and committed perjury to the Trademark Trial and Appeal Board (TTAB).

There is substantial and credible information that Petitioner lied under oath to the TTAB.

## Plaintiff's Testimony

The detail is critical. The detail provides credibility and corroboration to the Plaintiff's testimony. It also demonstrates with clarity that the Plaintiff lied under oath both in their "Brief in Support of Judgment for Petitioner" (filed October 27, 2014) and to the Petitioner's motion for sanctions in the form of default judgment (filed November 1, 2013) for Respondent's failure to file initial disclosures and his delay of these proceedings.

There is substantial and credible information that the Petitioner lied to the TTAB and were abundant and calculating.

The Petitioner lied under oath with an affidavit to purposely "misleading" the TTAB.

In sum, based on all of the evidence and considering the Plaintiff's various testimony, there is substantial and credible information that the Plaintiff lied under oath and committed perjury to the TTAB.

WHEREFORE, the Respondent requests this Honorable Board to:

a. Motion to Deny the Brief in Support of Judgment for Petitioner.

b. Dismiss the Petitioner's Amended Petition to Cancel.

c. Dismiss Petition for Cancellation.

d. Motion for Judgment on behalf of the Responded against the Plaintiff's failure to prosecute or prove case.

c. An Order granting a Default Judgment against the Plaintiff, Steven A. Westlake.

d. An Order for Sanctions against the Plaintiff for committing perjury to the Trademark and Appeal Board (TTAB) and fabricated "evidence."

e. Logically, a default judgment is the only sanction which makes sense;

- Striking all or part of Plaintiff's pleadings
- Refusing to allow Plaintiff to support his claim.
- Prohibiting Plaintiff from introducing evidence (whatever it may be.)

Sworn and subscribed before me this 5th day of December, 2014 WHEREFORE, I respectfully ask this Board for a Motion on Behalf of the Respondent to Deny Brief in Support of Judgment for Petition and declare the Plaintiff's Amended Petition be cancelled.

WHEREFORE, I respectfully request that this Board enter an Order Granting a Default Judgment on behalf of the Respondent, Edgar Alexander Barrera against the Plaintiff, Steven A. Westlake.

WHEREFORE, Respondent respectfully asks for a Motion against the Plaintiff to enter an Order Granting Default Judgment on behalf of the Respondent based upon the foregoing reasons.

With a dismissal with prejudice is dismissal of a case on merits after adjudication. The Plaintiff is barred from beginning an action on the same claim. Dismissal with prejudice is a final judgment and the case becomes *res judicata* on the claims that were or could have been brought in it.

The Respondent respectfully requests that the TTAB "Dismiss with Prejudice" the instant case and any other relief the Board deems just and proper.

Certified and Respectfully submitted by:

Edgar Alexander Barrera, Respondent
22159 Ladera Street
Grand Terrace, CA 92313

Dated: December 5th 2014        Telephone (321) 747-8565

*STATE OF FLORIDA*
*County of VOLUSIA*

Sworn and subscribed before me this 5th day of December, 2014

Notary Public, State of Florida
Commission Expires *13 Oct 2017*


ROGER LEE TIFFANY
MY COMMISSION # FF 062333
EXPIRES: October 13, 2017
Bonded Thru Budget Notary Services

ROGER LEE TIFFANY
Notary Public State of FLORIDA

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing instrument has been served upon all parties, at their address record by **Priority Mail 3-Day**, with **USPS Certified Mail 9502 6000 1663 4339 0004 63**, U.S. Postage, $9.05 prepaid, this 5th day of December 2014, addressed to:

Mark Levy, Hinman Howard & Kattel, LLP, 700 Security Mutual Bldg., 80 Exchange Street, Binghamton, NY 13902.

Certified and Respectfully submitted by:

Edgar Alexander Barrera, Respondent
22159 Ladera Street
Grand Terrace, CA 92313

Dated: December 5th 2014        Telephone (321) 747-8565

# EXHIBIT A

From: R. Emmett McAuliffe <rem@rieananberger.com>
To: Les Euell (leseuell@gmail.com) <leseuell@gmail.com>, E. Alexander Barrera (axleillsm@aol.com) <axlellism@aol.com>

Subject: FW: 2005 Edition

Date: Fri, Jul 16, 2010 4:36 pm

Attachments: National_Police_Gazette-September_2005.pdf (5767K)

FYI

From: R. Emmett McAuliffe
Sent: Friday, July 16, 2010 3:33 PM
To: saw@policegazette.us
Subject: 2005 Edition

Hi Mr. Westlake:

I see your attorney still has not entered an appearance. Please find enclosed the attached issue from 2005. If this issue is valid, it would seem to me your case goes away and therefore what are we fighting about? But I'd like to know your comments.

Feel free to call and discuss.

# EXHIBIT B



ISSN 0047-9039

THE NATIONAL

POLICE GAZETTE

THE LEADING ILLUSTRATED SPORTING JOURNAL IN AMERICA.

VOL. 161, NO. 1    NEW YORK-LOS ANGELES-LAS VEGAS: SEPTEMBER 2005    PRICE $5.00

# The Immortal Irving Berlin



**HE CREATED A NATIONAL TREASURY OF SONG**

Classical composer Douglas Moore ranked Berlin with Stephen Foster, Walt Whitman, and Carl Sandburg as a "great American minstrel," who "caught and immortalized in his songs what we say, what we think about, and what we believe."

Case 1:16-1189   Document: 14   Page: 45   Filed: 03/18/2016

# 160 YEARS AND STILL IN THE PINK!
## Police Gazette Pioneered Modern Journalism



George Wilkes (1817-1885) co-founded the Police Gazette in 1845. Publishing the sensational crime sheet was a relatively brief chapter in Wilkes' remarkable career as pioneer sports editor, transcontinental railroad promoter, and confidante of statesmen like Abraham Lincoln and Ulysses S. Grant.

### By NAT K. PERLOW

*For more than 130 years The National Police Gazette has been an eyewitness to the American scene. A Police Gazette reporter was there when Lincoln was shot . . .when Jesse James terrorized the West. . . when John L. Sullivan won the heavyweight title. . . when the first man to die in the electric chair was electrocuted. . . when America's first Olympic team brought glory to the Stars and Stripes...*

Yes, the *Police Gazette* was everywhere, reporting on everything from the secret life of America's First Sex Symbol to the trails and tribulations of America's First Underworld Czar.

It all began in 1844, when a young journalist named George Wilkes was in a New York jail for the sixth time, after a campaign of exposing vice and corruption in that great city, and upsetting police authorities as much as criminals. His lawyer, Enoch E. Camp, suggested they start a new journal to combat crime.

So *The National Police Gazette* was born. The first number appeared September 13, 1845, and this new weekly was dedicated to the exposure of crime and corruption. The journal named criminals and those who shielded them. A regular feature from the first number onwards was a series entitled "The Lives of the Felons," compiled from police records. An early issue stated:

*We offer this week a most interesting record of horrid murders, outrageous robberies, bold forgeries, astounding burglaries, hideous rapes, vulgar seductions and recent*



This is the front page of the first known edition of the Police Gazette, dated Oct. 18, 1845. Publishers Wilkes and Camp launched the paper with the idea of publicizing the low life of New York, already one of the world's great centers of trade but suffering from overcrowding, filth, and crime. Almost at once, their reporting brought threats and worse from criminals afraid of exposure. This first edition featured a "Lives of the Felons" story about one Robert Sutton, a.k.a. "Bob the Wheeler." The story incited a free-for-all between Sutton's supporters and enemies at an underworld dive called the Gin and Calumus Hall. The evening's score was one barfly dead, the owner missing two fingers and the tip of one ear, and many other drinkers bruised and bloodied. The fight was stopped by the timely arrival of a squad of police with a paddy wagon. No surprise, an account of the melee was published in the next edition of the Police Gazette.

*exploits of pickpockets and hotel thieves in various parts of the country.*

What more could one expect for a nickel? Within a few weeks the *Gazette* reached a circulation of 13,000

Editors Camp and Wilkes were obliged to maintain a private bodyguard at the *Gazette* offices, which were besieged by angry gangs on several occasions. In an 1850 assault on the Gazette there were six deaths, among them the paper's star reporter Andrew Frost.

The *Gazette* also waged war on lax authorities, and even had the temerity to attack Police Chief George W. Matsell. Ironically, Matsell himself was to become proprietor of the Gazette in 1857.

Enoch E. Camp (1811-1853) shares credit with Wilkes as founder of the Police Gazette — evidence suggests it was he who persuaded Wilkes that New York needed a newspaper exclusively devoted to exposing crime. But his posthumous reputation came more from his practice as a top criminal attorney.

*Police Gazette*, existing somehow without a salary, and in 1877 borrowed enough capital to become proprietor.

So began the great Pink Period of *The National Police Gazette*, nearly half a century of daring journalism that built a circulation of over 2,500,000 copies, with additional distribution in twenty-six different countries. It made Richard K. Fox a full-fledged millionaire.

The Pink Paper gave the *Gazette* a unique flavor. Although claimed as an original idea, tinted paper may have been suggested by the British journal *The Sporting Times* (also known as *The Pink 'Un*), which had flourished ever since 1865. *The Pink 'Un*, in turn, was reminiscent of risqué French journals on colored paper, like the Parisian *Le Piron*. Pink was suggestive of flesh or fashionable lingerie, and it was the astonishing infusion of sex which made the *Gazette* rank as the supreme stag journal of its time.

Each issue of the 16 page paper featured a full-page cover engraving, usually illustrating a dramatic news story involving shapely feminine limbs. The *Gazette's* major circulation was saloons, hotels, and barber shops. The standard vaudeville gag was: Seen the latest Gazette? — No I shave myself."

Of course, the *Gazette* had rivals, but they lacked the editorial genius of Richard K. Fox. The *Gazette* became the leading popular weekly of the gaslight era.

It fearlessly exposed crime and corruption, and revelled in the sins and follies of the day. It opened

After initial success, the *Gazette* circulation dropped alarmingly after the Civil War, when the paper no longer met a national mood. When Chief Matsell bought the *Gazette* he introduced more sport and sex, and devoted a section to "Beauties of the Stage." It was the right formula, but Matsell was obliged to dispose of the paper to the engravers, who kept it afloat for another couple of years.

The man who eventually rejuvenated the ailing Gazette and established its familiar pink format was Richard K. Fox, one of the most colorful popular journalists of the 19th century. Fox was a Belfast man, who emigrated to New York without any capital. He became business manager of *The National*

(Continued on next page)



**PUBLISHED BY FRANKLIN PRINTING COMPANY**

Page: 46

**EDITORS SINCE 1845**

Enoch E Camp and George Wilkes, 1845-1848, George Wilkes, 1848-1852, R Lexow, 1853-1855, Robert A Seymour, 1855-1857, George W. Matsell and William Mackellar, 1857-1874, Herbert R Mooney and Charles A. Lederer, 1873-75, Mooney, Lederer & Co , 1875-1877, Richard K Fox, 1877-1922; Ralph D. Robinson, 1922-1932; Merle Hersey Williams, 1933-1935, George A. Wells, Editor, H H Roswell, Executive Editor, 1935-1937, H H Roswell, 1937-1968, N K Perlow, 1968-1988, Police Gazette Printing House, 1988-1991, Franklin Printing Company, 1991-current.



*George W. Matsell (1811-1877) became New York's first police chief in 1845, losing his Job in 1857 in a turf fight with Albany. He then purchased the Police Gazette and ran it until 1873, with the paper's coverage of the Lincoln assassination its major accomplishment.*



*Richard K. Fox (1846-1922) took the Police Gazette to new heights during the Gilded Age of the 19th century. His greatest accomplishment was creating the first dedicated sports section in an American newspaper, with the emphasis on boxing and baseball.*



*Fox was a tireless promoter of sporting events, less for the money they made than the publicity that increased the value of the Police Gazette's advertising space. Although Fox did more than any promoter of his era to legitimize boxing, he was also willing to put his money behind oddball events like hair-cutting and oyster-shucking competitions. Fox also promoted sports that were prominent in the 19th century but have since lost popularity — for example, walking races. In this woodcut, champion walker Frank Miller and his dog both seem undistracted by a crowd of admirers.*

# The style-setter in sensational news

*(Continued from previous page)*

up a new world of sport in prizefighting. Most of all it depicted the amazingly progressive women of the period in pictures that make modern tabloids seem out of date. Here are vivid illustrations of female abortionists, blackmailers, fencers, cigar smokers, side by side with stage beauties, and honest working girls living in frightful poverty and exposed to every conceivable peril

The *Gazette's* wood engravings had a tremendous impact lacking in present-day half-tone photographs, and although these illustrations were produced at top speed there was considerable skill and verve in their execution The regular artists included George G White, author of a book on drawing, George E McEvoy, a well-known cartoonist, and an Englishman Matt Morgan, and others There were special *Police Gazette* belts or medals for champion singers, dancers, oyster openers, drink mixers, and barbers (fastest haircut was under thirty seconds!) Most of all, Fox did more than anyone else to legalize the status of public boxing contests in New York, defending prize fighters in court, and promoting contests that have become legendary

Boxing was an underground sport boxing bouts and defied the law to stop them—and the police did *Gazette* lawyers argued in court that the matches were an "exhibition in the art of self defense " The judges agreed and, because of it, boxing became a legalized sport

It was the *Police Gazette* which took the unknown Boston Strong Boy, John L Sullivan, and publicized his battles until he became a household name—the greatest sports hero of the 1890s

Of course, the *Gazette* also reflects more emancipated American origins, particularly depicting women in a way well ahead of the time Girls were featured doing unusual, courageous, or desperate acts, and invading the world of men with a verve and competence that makes modern Women's Liberation look dowdy and boring by comparison.

The sexiness of the *Gazette* illustrations also has a peculiar innocence which today has a great period charm There is nothing nasty about these pictures They were certainly titillating to young men of the period who realized that girls not only had delicately turned ankles but also delicious waists and swelling thighs

went flying and cleavage was exposed Whether the artist depicted the awful temptations of workinggirls or the gilded vice of demimondaines, there was a sheer voluptuousness about it all that made the pulse beat faster Today's blue movies and nudist magazines are peculiarly cold and passion-killing by comparison

The importance of the *Police Gazette* in our journalism is profound It developed editorial formulas which remain the basis for many leading magazines It is the grand daddy of today's sensational tabloids Its sports pages were imitated by newspapers, making it the inventor of the modern sports page, and the forerunner of modern sports magazines

The true detective magazines are an outgrowth of the popularity achieved by the crime stories originating in the *Police Gazette* The first pinup of leg art appeared in the *Gazette* Its woodcuts of buxom beauties in tight corsets shocked Victorian America in the 1890s The *Police Gazette* girls became famous in song and legend They prompted Irving Berlin to write a popular tune of the day, "The Pretty Young Brunette on the Pink Police Gazette "

Although the *Gazette* is identified with America's scarlet past, it still is a potent voice in the modern era The last U S Senator Estes Kefauver credited the *Police Gazette's* exposure of gangsterism with giving him the idea for his famous investigation into organized crime

A series of articles in the 1950s, in which the *Gazette* exposed the use of dangerous additives in food prompted former U S Senator Tom Hennings to crusade for stronger food and drug laws throughout the country

The best known *Police Gazette* shocker of recent years was its series, "Hitler is Alive!" It sparked renewed interest in Nazi war criminals and influenced the West German government to extend its statute of limitations so that the hunt for fugitives could go on

Critics may call the *Gazette* naughty, gaudy and bawdy but nobody, at any time, ever said it was dull

*One of the last old-time newspapermen, Nat K. Perlow served as managing editor of The National Police Gazette from 1945 to 1968, and editor from 1968 until his death in 1988. Among other accomplishments in a colorful career, Perlow helped U.S. Senator Estes Kefauver set up the famous organized crime hearings of 1950.*



*Berlin disappointed his legions of fans by becoming reclusive late in life. This rare shot of Berlin in his 86th year was taken by noted New York photographer Jill Krementz. Berlin was, of course, his own lyricist, so he was a good entry in Krementz's lifelong project of photographing famous American writers. Krementz's 1974 pictures are believed to be the last professional photographs of Berlin.*

# Meet Irving Berlin

### By SIDNEY SKOLSKY

THE easiest thing in the world to write is a song. The hardest thing in the world to write is a song hit. Sixty million copies can't be wrong.

No matter how well he is dressed, if his hair is a trifle mussed he doesn't look well dressed.

Never writes anything in longhand but his signature on a check. He prints everything.

He was born in Molzne, Russia, May 11, 1888. Came to this country at the age of four, the youngest of eight children. His mother was Leah Lipkin. His father, Moses, whose business it was to say prayers over meat to make it kosher, died when Irving was eight.

Is five feet six inches tall. Weighs 130 pounds. When working on a score of a show, he loses ten pounds.

Hasn't a hat face. Never owned a hat that looked good on him or sat properly on his head.

He ran away from home when he was fourteen. Went to Callahan's

*(Continued on next page)*



*After enduring an impoverished childhood on the streets of New York, Berlin found early success as a Tin Pan Alley tunesmith. His 1911 breakthrough hit was "Alexander's Ragtime Band," which actually wasn't ragtime at all but a bouncy little song about the new style of syncopated music pioneered by African-American musicians like Scott Joplin. "Alexander's Ragtime Band" became such a standard that it served as a the namesake for a 1938 musical film that featured no less than 27 other Berlin songs. Here Berlin is at the piano with stars Alice Faye, Tyrone Power, and Don Ameche.*

Originally published in THE NATIONAL POLICE GAZETTE, April 1953



"White Christmas" is not only the top-selling Christmas song of all time, but the top single, period. Bing Crosby's initial reaction to the tune was lukewarm: "I don't think we have any problems with that one, Irving." Crosby introduced it to radio audiences in the Christmas Day, 1941 broadcast of "The Kraft Music Hall," then recorded it as part of an album of six songs released in July, 1942. But "White Christmas" didn't really catch on until later that summer, when Crosby reprised it in a duet with Marjorie Reynolds in the movie "Holliday Inn."



The nostalgic "White Christmas" achieved immortality because it hit a nerve with thousands of homesick American servicemen and the families awaiting their return. On the other hand, "Annie Get Your Gun" was the perfect Broadway show for post-war audiences just looking for a good time. Trumpet-voiced Ethel Merman (right) starred as Annie Oakley, trick-shot artist of the "Buffalo Bill's Wild West" shows. Oakley herself (left) was from the wild west of Ohio, but mastered rifle marksmanship better than any buffalo hunter, winning national fame and a chestful of medals -- including one from The National Police Gazette, whose publisher, Richard K. Fox, promoted her career.



*Berlin was a great admirer of Stephen Foster, America's first master of popular song. And just like Foster, Berlin's best creations aren't just songs but bits of Americana.*



*Rivaling "White Christmas" as the greatest Berlin song is "God Bless America," beloved for generations as a sort of alternate national anthem. Kate Smith's 50-year career in radio, television, and recording was built largely on her heartfelt rendition of this one patriotic tune.*



*Berlin became a lifelong fan of the Police Gazette right at the source. Publisher Richard K. Fox was one of Berlin's regular customers when he worked as a singing waiter in Mike Salter's saloon. Through Fox and Salter, young Berlin befriended a host of colorful New York characters — and none more so than Chuck Connors, the unofficial "Mayor of Chinatown." Connors, shown here in a characteristic pose holding forth to barroom buddies, made an unusual living as an urban tour guide to the low life of Mott and Doyers streets, with an occasional staged tong war thrown in for thrills.*

# Berlin Learned Craft in NYC's Tough Bowery

*(Continued from previous page)*

saloon on the Bowery. Here he sang "The Mansion of Aching Hearts." His salary was the coins tossed at him. Next stop, Mike Salter's saloon, where he was a singing waiter. The guide on the trip to Chinatown now points out the spot.

For the past two years he has been wearing glasses when reading.

Is a very nervous man. Generally chews gum. When alone in a room he'll cover miles pacing the floor. Floor pacing is his only exercise.

On January 4, 1926 he married Ellin Mackay (whose father owned Postal Telegraph). They have a daughter Mary Ellin. He hasn't any pet name for the wife, and she hasn't any for him.

He's a bad sleeper. Can go to bed in time to get twelve hours sleep and gets only four.

*(Continued on next page)*



*Berlin would sometimes write songs to fill a particular need in a movie or Broadway musical. But more often, he would dictate any promising idea to his copyist, in the hope that it might eventually find a niche in a show. One such "trunk song" was "The Girl on the Police Gazette" written in 1935 to celebrate neighbor Harold Roswell's purchase of the old scandal sheet. It was finally sung by Dick Powell (center) in the 1937 movie "On the Avenue."*

# Greatness Never Came Easy

*(Continued from previous page)*

One of his hit songs, The Little Things In Life," was written while he was on his honeymoon

Originally his name was Israel Baline When fifteen he changed Baline to Berlin because everyone pronounced it that way Later he changed Izzy to Irving. When he wrote his first song, "Marie From Sunny Italy" (he wrote only the first lyric) he was still working at Mike Salter's saloon Was afraid to sign the song Irving Berlin Though the boys would throw bar rags at him for puttin' on the ritz, That initial song is signed I Berlin

### Working on a Lyric

Crowds frighten him So do certain individuals.

Finds songwriting a hard job. More perspiration than inspiration Often while the nation is singing one of his songs, he's still working on it and will change a line in the lyric The only mark on his body is a scar on his forehead It was received on a Washington's birthday in Cherry Street, trying to start a bonfire

Can play the piano in F Sharp only Has a specially constructed piano with a sliding keyboard This enables him to play in other keys although still playing in F Sharp He had the piano for fifteen years Recently had a copy of it built for his home

A barber can do more for him than a doctor Has had the same barber for years After a hard day's work he runs to his barber

His daughter Mary Ellin was taught by father to play scale on the piano Once at four, before company, Mary Ellin was asked to play the piano She banged away on the keys with both hands "Darling," said Mrs. Berlin, "play with one finger" Mary Ellin looked up and said. "Oh, you mean like daddy plays"

Is always complaining about his stomach and eats everything His favorite restaurant is the Far East Here, for many years, the chef has been preparing a special chop suey for him Loves Chinese food He eats it with chopsticks

### High Spot of Career

Considers "What'll I Do" as good as he ever wrote, Thinks "Alexander's Ragtime Band" was the high spot of his career Of all the songs ever written he'd love to be the author of "The Rosary" and "The St Louis Blues"

Doesn't read much and has a difficult time finishing a book When he attends the theatre he prefers to see a melodrama.

Has his clothes made in London When it arrives he puts it on No alterations are necessary

His secret and great ambition was to be a musician He'd give anything—even many of his song hits—to be able to play the piano

**(P.S. He's written more than 1,000 songs. All the proceeds from his famous "God Bless America" go to the Boy Scouts. His best-selling hit is "White Christmas," which sold more than 3,500,000 copies since 1942.**

**In 1937, he wrote "The Girl on the Police Gazette," hit song for the musical movie "On the Avenue," starring Alice Faye and Dick Powell. This tune is still a juke-box favorite.**

**He also wrote a Broadway musical comedy in collaboration with playwright Robert Sherwood, titled "Miss Liberty," featuring a *Police Gazette* reporter.**

**Berlin lives in a mansion on New York's Beekman Place. Loves to mess around the kitchen; cooking is his hobby.**

**At 65, he's working on a couple of movies for Hollywood and a new Broadway musical. — THE EDITOR.)**



*Doyers Street, shown around 1909, was the heart of New York's colorful but sometimes violent China-town. Not all businesses were Chinese, however. Both Irving Berlin and vaudeville immortal Al Jolson got their start singing at Callahan's saloon, which may be one of the buildings on the right.*



*"Carefree" (1938) was the eighth and shortest of the Fred Astaire-Ginger Rogers musicals, and the third with music by Irving Berlin. Only four musical numbers were included in the final cut, with "Change Partners" easily the best of the lot. The dance duo would collaborate for the last time with Berlin in 1939's "The Story of Vernon and Irene Castle."*

## About the Author

In more than a half-century in show business, Sidney Skolsky (1905-1983) worked his way up from Broadway press agent to one of the top columnists covering the movie industry

Skolsky is one of several show business people who claimed to have given the name "Oscar" to the Academy Award statuette In his 1975 memoir *Don't Get Me Wrong—I Love Hollywood*, Skolsky recounted that he was in a hurry to send his copy from the 1934 award ceremony Having trouble spelling "statuette." Skolsky decided to write that Katherine Hepburn "won the Oscar" for her performance in "Morning Glory." Skolsky wrote that the name Oscar came from an old vaudeville routine —"will you have a cigar, Oscar." Over the following months, Skolsky kept calling the award Oscar in his columns By 1939, the Academy of Motion Picture Arts and Sciences had adopted the name officially



*Skolsky's 1954 book Marilyn: The Marilyn Monroe Story helped boost the legendary actress' early career. Heavily illustrated, it's considered a collectible piece of Monroe memorabilia.*



**TOP:** *In 1950, Berlin teamed again with Ethel Merman in "Call Me Madam," a musical satire on international politics. Merman played a Washington socialite appointed ambassador to the fictional postage stamp country of Lichtenburg. Some of the comedy in "Call Me Madam" is still topical — notably the American penchant for shoveling billions at impecunious nations. "Call Me Madam" was made into a successful 1953 movie, also starring Merman.*

**RIGHT:** *Archie and Edith Bunker (Carroll O'Connor and Jean Stapleton) introduced each weekly episode of television's "All in the Family" by singing "Those Were the Days." Late in life, Berlin said he wished he had had a chance to write a song for the hit 1970s series. "Those Were the Days" was actually written by Charles Strouse, noted composer of "Bye Bye Birdie" and "Annie." Berlin also remarked about a certain resemblance between Archie Bunker and his old friend Richard K. Fox — despite being guilty of an occasional bigoted remark, both men were basically decent when dealing with real people of all backgrounds.*





## Fwd: 2005 Edition

Les Euell <leseuell@gmail.com>
To: Les Euell <leseuell@gmail.com>

Mon, Sep 29, 2014 at 4:33 PM

Sent from my iPad

Begin forwarded message:

> From: "R. Emmett McAuliffe" <rem@riezmanberger.com>
> Date: July 16, 2010 at 4:35:53 PM EDT
> To: "Les Euell (leseuell@gmail.com)" <leseuell@gmail.com>, "E. Alexander Barrera
> (axlellism@aol.com)" <axlellism@aol.com>
> Subject: FW: 2005 Edition

FYI

From: R. Emmett McAuliffe
Sent: Friday, July 16, 2010 3:33 PM
To: saw@policegazette.us
Subject: 2005 Edition

Hi Mr. Westlake:

I see your attorney still has not entered an appearance. Please find enclosed the attached issue
from 2005. If this issue is valid, it would seem to me your case goes away and therefore what are
we fighting about?  But I'd like to know your comments.

Feel free to call and discuss.

⌐ National Police Gazette-September 2005.pdf
   2944K

# EXHIBIT C



## Fwd: nothing from Westlake

Les Euell <leseuell@gmail.com>                                    Wed, Nov 12, 2014 at 11:55 PM
To: axlellism@gmail.com
Cc: axlellism@outlook.com


Sent from my iPad

Begin forwarded message:

> **From:** "R. Emmett McAuliffe" <rem@riezmanberger.com>
> **Date:** June 30, 2010 at 5:07:55 PM EDT
> **To:** "Les Euell (leseuell@gmail.com)" <leseuell@gmail.com>
> **Subject:** nothing from Westlake


### Riezman**Berger**

R. Emmett McAuliffe
**Attorney At Law**
Chair, Intellectual Property and Media Law Practice Group
7700 Bonhomme Avenue 7th Floor
St. Louis (Clayton), Missouri 63105
p: 314-727-0101 x. 110
f: 314-727-6158


*Practice Description and vCard*


rem@riezmanberger.com


INFORMATION DISCLAIMER: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. Federal tax advice contained in this e-mail, including attachments, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Service.
CONFIDENTIAL AND PRIVILEGED: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by replying to this message and then delete it from your computer. All e-mail sent to this address will be received by the Riezman Berger PC e-mail system and is subject to archiving and review by someone other than the recipient.

# EXHIBIT D



# POLICE GAZETTE

### THE LEADING ILLUSTRATED SPORTING JOURNAL IN AMERICA.

**VOL. 161, NO. 7   NEW YORK-LOS ANGELES-LAS VEGAS: MARCH 2006   PRICE $5.00**

# Veronica Lake: Femme Fatale



No actress ever got more mileage out of a hairstyle than Veronica Lake, who teased movie audiences with her "peek-a-boo" blonde locks in a string of 1940s *film noir* classics like "This Gun for Hire" and "The Glass Key." But emotional problems ended her flirtation with major stardom – Paramount dropped her contract before she turned 30.



*The most famous image of the 1950-51 Kefauver crime hearings is surely the fidgety hands of New York mob boss Frank Costello. Although Costello agreed to testify and not take the Fifth Amendment, he was nervous about having his face shown on national television. Kefauver's senior adviser, Nat K. Perlow — who was on leave from his regular job as managing editor of the Police Gazette — proposed showing only Costello's hands. Rather than taking heat off Costello, the effect was so sinister that it immediately fixed his public image as a shadowy criminal mastermind — which was basically the truth. Perlow later worked on Kefauver's 1952 presidential campaign before resuming his journalistic career, parlaying his experience with the venerable Police Gazette into creating the new generation of supermarket tabloids.*

# Prime Minister of the Underworld

## Frank Costello's Hands Mesmerized Millions in First TV Crime Hearings

### By RON GOULART

The high-rated performers on television in 1951 were Milton Berle, Howdy Doody, and Frank Costello. Millions of people watched the underworld leader as he appeared on the televised hearings of the Kefauver Committee.

Up until March of 1951 he had been a mild-mannered, millionaire gangster who was seldom bothered. People liked him and called him Uncle Frank. Kefauver and TV challenged all that.

Costello had been getting in trouble with the law for most of this century. But even in his apprentice years there had never been any serious consequences.

Frank Costello thrived for decades, top man in the syndicate, millionaire from his rackets, and an important political force. He was well known in New York, watched and wire-tapped by various official groups. Then came the Kefauver Committee.

Its full name was the Special Committee to Investigate Organized Crime in Interstate Commerce. The chairman of the committee was the late Senator C. Estes Kefauver of Tennessee.

When Kefauver went to the Senate in 1949 he felt there was "a desperate need for learning the facts about crime in America." I took the issue to the floor of the United States Senate by introducing a bill calling for a full-scale Senate investigation of crime in interstate commerce."

#### Cross-Country Investigation

Kefauver became chairman of the resulting committee in May of 1950. He would travel 52,000 miles around the country in his year as head of the investigating body. Hearings were held in Miami, Kansas City, Detroit, Chicago, Cleveland, New Orleans, Los Angeles, and New York.

After a year of hearings, many televised, the committee concluded that a nationwide crime syndicate existed, that political corruption was flourishing, that legitimate businesses were being taken over by hoods, and that the federal enforcement agencies should do something about it.

How much has been done in the sixteen years since the Kefauver Committee told the facts about organized crime is open for debate.



### THE REAL DON CORLEONE

*Frank Costello was born Francesco Castiglia in 1891. His family emigrated from the impoverished Calabria region of southern Italy in 1900. After a short jail term for carrying a concealed weapon, young Costello abandoned street-level crime in favor of illegal enterprises like bootlegging and gambling. By the time Costello was subpoenaed to testify before the Kefauver Committee in 1951, he was virtually the chief executive officer of the New York underworld, and almost respectable thanks to his connections with politicians and business leaders. Costello also had major pull with the Tammany Hall Democratic machine. He also moved the mob into a host of legitimate businesses, for example, distributing meat and poultry.*



A typical session of the Senate Special Committee to Investigate Crime in Interstate Commerce, this time in New York. Left to right: unidentified staff member; Sen. Charles W. Tobey (R-N.H.); Sen. Herbert R. O'Conor (D-Md.); Sen. C. Estes Kefauver (D-Tenn.), committee chairman; and chief counsel Rudolph Halley.

# Many Questions, Few Straight Answers



The 1950-51 Kefauver hearings were the biggest news story covered by the young medium of television up to that time. With the lawlessness of the 1920s still a big part of living memory, viewers could enjoy a good fright over revelations that the bootleggers of an earlier era were now the bosses of a national crime syndicate. The hearings were so popular that they were even shown in some movie theaters.

The Crime Committee had done considerable research on Costello, including private discussions with him, before the public hearing of March, 1951. In an interim report issued by the committee Costello was called "The outstanding underworld leader of the New York City area."

## An Evasive Witness

The televised questioning of Costello began on March 13 and went on for seven days. The questioning was prolonged because of Costello's evasive testimony.

"We could have finished up with him in a day," Kefauver later said. "The principal effect of his tactics was to prolong what must have been an ordeal for him."

The questioning became intricate almost as soon as it started. Counsel Rudolph Halley asked Costello about his aliases, whether he'd ever used the name Saverio. Costello said he might have.

"What do you mean you might have used the name Saverio? Don't you know very well you used the name Saverio?"

"I might have used it, yes."

"I will not accept that answer. Did you or did you not use it?"

"Well, I might have."

"Well, you know you used it, do you not?"

"Well, I don't know, I won't say I didn't."



Shown here without the trademark coonskin cap he sometimes wore on campaign, C. Estes Kefauver was elected senator in from Tennessee in 1949, after five terms in the House of Representatives. The crime hearings made Kefauver a star of the Democratic party for the rest of the 1950s. He narrowly lost the presidential nomination to Adlai Stevenson in 1952. Trying again as Stevenson's running mate, Kefauver's popularity did little to boost a Democratic ticket that was doomed by Stevenson's intellectual image and the Eisenhower administration's track record of postwar prosperity.



**ALEXANDER BARRERA, Publisher**

'AMERICA'S OLDEST MAGAZINE'
**EDITORS SINCE 1845**

Enoch E. Camp and George Wilkes, 1845-1848, George Wilkes, 1848-1852; R. Lexow, 1853-1855, Robert A. Seymour, 1855-1857; George W. Matsell and William Mackellar, 1857-1874, Herbert R. Mooney and Charles A. Lederer, 1873-75, Mooney, Lederer & Co., 1875-1877, Richard K. Fox, 1877-1922, Ralph D. Robinson, 1922-1932, Merle Hersey Williams, 1933-1935, George A. Wells, Editor, H. H. Roswell, Executive Editor, 1935-1937, H. H. Roswell, 1937-1968, N. K. Perlow, 1968-1988, Police Gazette Printing House, 1988-1991, Franklin Printing Company, 1991-2005

# Hearings Heralded Age of TV News

Seven days of this kind of exchange. It took persistence on both sides. In the earlier closed sessions Costello had promised to bring a statement of his net worth. Now in public he refused to produce it

Halley asked, "Now Mr. Costello, have you brought with you a financial statement showing your net worth today?"

"No."

"What is your net worth today?"

"I refuse to answer that question."

"On what grounds?"

"I'm going to exercise my rights that it might tend to incriminate me."

Costello, us the hearing progressed, threatened to walk out if he wasn't treated better. He did get up once and stalk out but he later came back. After listening to Costello, to William O'Dwyer after other testimony, and through facts gathered, the committee reached several conclusions about New York City and Frank Costello

Frank Costello has close personal friendships, working relationships, and mutual financial interest with leading racketeers. Frank Costello has exercised a major influence upon the New York Democratic organization, Tammany Hall

Despite all this, the first legal step taken against Costello was a citation for contempt

## Troubles Pile Up

But after the Kefauver hearings Costello was in continuing legal trouble. The tax people came after him, the government began deportation proceedings because they said Costello lied about his bootlegging activities when he was naturalized in 1925

He spent time in jail, and in prison on the contempt charge. Since 1951 he's been involved in some 50 court actions. In May of 1957 an overweight gunman tried to kill Gostello in the foyer of his Central Park West apartment. The assas-



*Frank Costello's fictional counterpart: Marlon Brando in his greatest role as Don Vito Corleone in "The Godfather" (1972).*

tried to get me." Costello admitted, never telling who.

It seemed possible the syndicate was not happy with the now-famous Prime Minister and was taking the usual syndicate steps. Still the gun man only shot once, not usual in a syndicate killing

Today Costello's position in the underworld is ambiguous. He's in his seventies, and insiders say, he's now retired. During the committee's hearings, Costello was asked why he's bothered to become a citizen. "Because." Frank Costello explained, "I love this country"

---

# Leaving New York's Mean Streets ...

**EDITOR'S NOTE:** Ron Goulart's story about Kefauver committee hearings originally ran in the August, 1967 edition of *The National Police Gazette*. Rudolph Halley parlayed his reputation as committee counsel into a brief but stormy political career that included an unsuccessful run for New York mayor in 1953. He died just three years later at the early age of 43. Tennessee Sen. C. Estes Kefauver swept the 1952 Democratic presidential primaries but lost at the convention to Illinois Gov. Adlai Stevenson. Kefauver as also a serious contender in 1956, only this time he was selected as Stevenson's running mate. Kefauver remained an influential lawmaker until his sudden death at age 60 in 1963. His advisor, Nat K. Perlow, who suggested showing only Frank Costello's nervous hands on television, resumed the editorship of the *Police Gazette* and other magazines with considerable success, dying at age 72 in 1988. Costello's would-be assassin in 1957 was none other than Vincent "The Chin" Gigante, who by the 1980s was boss of New York's Genovese crime family. Gigante died in 2005 at age 77, while serving a 12-year federal sentence for racketeering. Frank Costello survived the gang wars and settled into a comfortable role as the mob's elder statesman. He was finally felled by a heart attack at age 82 in 1973. Although the character of Don Vito Corleone in "The Godfather" is said to have been based on several mafia bosses, the resemblance to Costello is hard to overlook. Marlon Brando is said to have listened to Kefauver hearing tapes in order to mimic Costello's raspy voice.

# ... Headed for Hollywood and Vine

Bob Hartford's profile of Veronica Lake starting on page 5 originally ran in *The National Police Gazette's* edition of August 1960. It was also around this time that Lake began a long relationship with the *Police Gazette's* managing editor, Nat K. Perlow, that lasted until her death in 1973. Although Lake's movie career was essentially over, she published a well-received autobiography in 1969. In it she described Perlow as "one of the sweethearts of the western world," suggesting that the cigar-chomping newspaperman had his softer side. Lake's memoirs were the one clear accomplishment of her final years. Most of the money from the book went toward financing her last movie in 1970. The low-budget shocker "Flesh Feast" attracted little attention. Lake played a mad scientist attempting to clone Adolf Hitler. Perhaps Perlow, famed for publishing the headline "Hitler Is Alive!" in a 1951 *Police Gazette*, influenced Lake's screenwriters. In any event, Perlow was with Lake until the end. The official version of Lake's passing is that she died in Burlington, Vt., from kidney failure brought on by years of drinking. Perlow maintained that Lake actually died in Montreal but that he drove her body across the border in order to fulfill her final wishes. Many published sources dismiss Perlow's account but the fact remains that he stood by this story until his own death in 1988

## The Queen of *Film Noir* Says ...

# YOU GOTTA GET A GIMMICK

## Veronica Lake's Blonde Tresses Became Silken Ladder to Stardom

### By BOB HARTFORD

Lovely Veronica Lake, once the hottest heartthrob for millions of movie fans, crossed her shapely legs, puffed elegantly and said "It's the gimmick that makes a movie star Talent has nothing to do with it Today, practically any attractive girl with a 38-inch bust and a seductive wiggle to her walk has most of the equipment necessary for stardom"

Nobody is better qualified to judge the potent power of a gimmick than Veronica, who parlayed a trim, attractive figure and a hank of silky blonde hair dangling over one eye into a fabulous legend

"Frankly, darling," she said, in her soft sophisticated voice, "if it hadn't been for that hair-do I would never have become a movie star."

Veronica—Ronnie to her friends—and I were dining at Albert's French Restaurant, one of the swank bistros in New York's Greenwich Village If you think the former movie queen is a forgotten star you're wrong—our interview was constantly interrupted by excited fans asking the glamorous star for her autograph

"You see what I mean?" said Ronnie, as she graciously signed her name for an admirer who looked like a prosperous stock broker "Very few people remember any of the pictures I have been in — but they all remember the peek-a-boo-bang"

### Accident Made Her a Star

And they still recognize Ronnie, although she no longer wears her hair in that seductive peek-a-boo bang. She now wears it combed sleekly back and tied in a pony tail

"Actually I became a star by accident," she told me, in between the interruptions. "Just for curiosity I went to a studio casting office with a girl friend who wanted a job as an extra—and while they were giving her a screen test one of the eager beaver talent scouts said

"'Hey, honey, why don't you take a test?'

"I didn't really think I stood a chance — but the next thing I knew I was signed up."

Ronnie daintily lit up a fresh cigarette, and smoked for a moment in silence, thinking of those exciting days when she first broke into show business



### A Classic Beauty in Full Bloom

*Veronica Lake is still fondly remembered by film buffs as one of the most glamourous stars of Hollywood's most glamourous era. This pinup from the height of her 1940s fame shows the "peek-a-boo" hairstyle that became her trademark. Lake rose to stardom in 1941's "Sullivan's Travels," the classic Great Depression drama directed by Preston Sturges. Other career highlights included the crime story "This Gun for Hire" in 1942, the first of four collaborations with Alan Ladd. But Lake developed a reputation for being unreliable on the set, and her film career was basically over after 1949. She died at age 50 in 1973, after a long decline into physical and emotional problems.*

"It was while I was posing for some publicity shots that the gimmick came." She said "My hair fell over one eye—and before I could brush it back the cameraman had caught it The photo was so interesting—different they called it—that it was published in newspapers and magazines all over the world Arthur Hornblow, the producer, saw the picture and recognized the potential for developing a box-office

personality with that hair style as the gimmick And that was that Almost overnight I became a star."

"But you were great as an actress." I said " It wasn't all just a gimmick "

"It's sweet of you to say so," Ronnie smiled. "I guess I was quick learning the tricks of the trade But it was still the hair-do gimmick that gave me the first big break and made me famous Without it I might have

struggled for years and never have gotten to be a star "

### Fame Came Early

Ronnie recalled her embarrassment when she got her first big role

"Remember," she said, "I was just a 17-year-old kid, with absolutely no acting experience, just a knack of wearing my hair in a new




*Brigitte Bardot and Sophia Loren could be Exhibits A and B in supporting the middle-aged Veronica Lake's argument that Hollywood's ideal of glamour changed —big time — during the 1950s and beyond. During Lake's rather short short film career in the 1940s, the emphasis was on trim figures and photogenic faces — which certainly helped the petite Lake, who stood just shy of 5 feet. Only during the prosperity of the post-war years did spectacular curves a la Bardot and Loren become the preferred look.*

# Glamour Rounds a Curve

way — half over my face. Like most girls of that age I had my own screen idol — and he was Joel Mc-Crea.

"And who do you think my first leading man was? No less a star than Joel! I wasn't so much thrilled as terrified. After we started shooting the picture, 'Sullivan's Travels,' Joel began to resent me and deliberately avoided me off the set.

"I was hurt. I didn't understand — until the director told me that Joel was humiliated because the studio was giving me top billing over him.

"It was ridiculous. I was an inexperienced Miss Nobody, and he was a talented star, but that illustrates the box office appeal of a gimmick."

### Subtle Sex Appeal

According to Miss Lake, today's top stars-such as Marilyn Monroe, Brigitte Bardot and Sophia Loren — would never have made the big league in Hollywood in the early '40s when Veronica, Betty Grable, Lana Turner and Ann Sheridan were the sex boats of the screen.



*Marie Wilson was one of the few Golden Age stars to anticipate the voluptuous look that Marilyn Monroe perfected in the 1950s. Her many film performances starting in 1934 helped create the "dumb blonde" comic image. The peak of Wilson's career was the title role of "My Friend Irma" from 1947 to 1954. Wilson starred as scatter-brained secretary Irma Peterson first on radio, then in two movies — which also introduced Dean Martin and Jerry Lewis to audiences – and finally a brief television run.*







Marilyn Monroe redefined movie glamour in the 1950s. Veronica Lake speculated that Monroe couldn't have risen to stardom without a gimmick. If Lake had her stray blonde locks, Monroe had her "sexy open-mouth stare." Both stars had difficult personal lives and reputations for unreliability on the set. While this destroyed Lake's career, Monroe managed to pull herself together sufficiently to give many great performances until her drug-induced death in 1962.

Marie McDonald first achieved stardom as a singer with Tommy Dorsey and other swing band leaders. She also became one of the more popular wartime pinup models, earning the nickname "The Body" after displaying her curvaceous figure in movies like 1942's "Pardon My Sarong." But her personal life was, if anything, even more troubled than Monroe's, with no less than six husbands. She died of a suspected drug overdose in 1965.

# Monroe: 'A Certain Charming Naiveté'

"In those days the public wasn't ready for big busts and curves," Ronnie explained. "The sex appeal of stars had to be subtle. When I first got into films, the entire Paramount lot was cluttered with gimmicks. There was Dorothy Lamour and her sarong, Paulette Goddard with her sweater and me with the peek-a-boo bang, just to name a few. It was very profitable for the studios, but I don't know that it did much for raising the standards of acting."

Veronica gives Marilyn Monroe credit for pioneering the new vogue in sex appeal.

"She was the first girl with an above average figure to break the jinx," she explained.

"Tell me how Marilyn Monroe made it," I asked.

"Well, during the war years when I hit the peak in Hollywood, there were plenty of good-looking girls with extraordinary physical measurements, but even those who managed to break into pictures never really became top flight stars. There was Marie Wilson, who had more than Monroe and Loren rolled into one, but producers only cast her in dumb blonde roles. Even Marie McDonald, who billed herself as 'The Body' never really caught the public's imagination.



Veronica Lake's first starring role was as a struggling actress called simply "The Girl" in 1941's "Sullivan's Travels." Directed by Preston Sturges, "Sullivan's Travels" was selected by the Library of Congress in 1990 for National Film Registry preservation. Lake was cast as the love interest for the title character, an idealistic film director played by Joel McCrea. Burned out after years of making escapist comedies, the director decides to research the underside of Depression-era life by taking to the road as a hobo. McCrea's character gets more than he bargained for, ultimately ending up in prison and only getting sprung when "The Girl" comes forward to unravel a case of mistaken identities. Fine as their on-screen chemistry was, the two stars got along so poorly that McCrea declined a chance to play opposite Lake in 1942's "I Married a Witch." Fredric March took the part — and also tangled with Lake.



*Veronica Lake is forever linked with another star who burned out early. She played opposite Alan Ladd in four movies, starting with "This Gun for Hire" and "The Glass Key," both from 1942. In this shot from their third collaboration, 1946's "The Blue Dahlia," Lake sports a shorter hairstyle than the famous "peek-a-boo" that had become her trademark. Hollywood legend has it that Ladd and Lake were partnered mainly because they were both short – Ladd is said to have stood no more than 5 feet, 6 inches. After three solid hits, they reunited in 1948's disappointing "Saigon," after which Paramount refused to renew Lake's contract, effectively ending her career. Ladd had some of his best work ahead of him, notably the 1953 western classic "Shane," but died suddenly in 1964, likely from alcohol poisoning.*

# Variations on the 'Peek-a-Boo'

"I think the reason Marilyn made it where others failed is that she has an appealing personality — a certain charming naiveté that caught the movie goers' fancy.

To every man she looked attainable, the average man's opinion of a swell girl, and to every girl she was an example of femininity.

But if she didn't exploit her figure and the gimmick of posing for pictures with a sexy-open mouth stare, Marilyn would never have reached the top."

I for one wasn't going to argue with Miss Lake. When you first meet Veronica you realize that it takes more than just a gimmick to make a top flight actress.

At 37, she is radiantly beautiful. Her blue eyes look at you with a frank appeal, and she carries her slim, shapely figure with a polished pose.

Veronica lives today in a comfortable, two and a half room apartment in New York's Greenwich Village. She is planning a new career in television and is once again looking for the right gimmick.



*Even with short hair, Lake looked every inch the femme fatale, as in this publicity shot opposite comedy star Eddie Bracken. Lake had a knack for alienating her co-stars that can't be explained away, considering her detractors included pros like Bracken, Joel McCrea, and Fredric March. Bracken won fame in the Preston Sturges-directed "Hail the Conquering Hero" and "The Miracle of Morgan's Creek," both 1944 hits. He appeared with Lake in three lesser movies in 1945. Bracken's film career stalled after 1953, but he found plenty of work on stage and television over the next 40 years. He died in 2002 at 87.*

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

ESTTA Tracking number: **ESTTA656584**

Filing date: **02/18/2015**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
### BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| Proceeding | 92052260 |
|---|---|
| Party | Plaintiff<br>Steven Westlake |
| Correspondence<br>Address | MARK LEVY<br>HINMAN HOWARD KATTELL LLP<br>80 EXCHANGE STREET, PO BOX 5250<br>BINGHAMTON, NY 13901<br>UNITED STATES<br>mlevy@hhk.com |
| Submission | Other Motions/Papers |
| Filer's Name | Mark Levy |
| Filer's e-mail | mlevy@hhk.com,amanzer@hhk.com |
| Signature | /Mark Levy/ |
| Date | 02/18/2015 |
| Attachments | Motion to Accept Delayed Response 021815.pdf(71736 bytes )<br>POLICE GAZETTE Response to TTAB Order to Show Cause 021815.pdf(45428<br>bytes ) |

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

|  |  |  |
|---|---|---|
| Steven A. Westlake | ) | Cancellation No.: 92/052,260 |
|  | ) |  |
| Petitioner, | ) | Mark: THE NATIONAL POLICE |
|  | ) | GAZETTE THE LEADING |
| v. | ) | ILLUSTRATED SPORTING |
|  | ) | JOURNAL IN AMERICA |
| Edgar Alexander Barrera, | ) |  |
|  | ) | Registration No.: 3,662,484 |
| Respondent. | ) |  |

# PETITIONER'S MOTION TO ACCEPT DELAYED RESPONSE

## TO THE ORDER TO SHOW CAUSE

Comes now Mark Levy, attorney for Petitioner Steven A. Westlake, and hereby submits a Motion to Accept Delayed Response in the above-captioned cancellation proceeding.

Due to unforeseen circumstances beyond Petitioner's control, Petitioner hereby moves this honorable Trademark Trial and Appeal Board to accept a delayed response to the Order to Show Cause dated January 28, 2015 due to excusable neglect, as described in detail in supporting Affidavits by Mark Levy and Amy Manzer, submitted herewith.

Page 1 of 3

Respectfully submitted,

Dated: February 18, 2015

By:

Mark Levy
Attorney for Petitioner
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (607) 723-6605

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing PETITIONER'S MOTION TO ACCEPT

DELAYED RESPONSE TO THE ORDER TO SHOW CAUSE in re: Steven A. Westlake

v. Edgar Alexander Barrera, Opposition No. 92/052,260, was served on Respondent,

this 18th day of February, 2015, by sending same via First Class Mail, postage prepaid,

to:

Edgar Alexander Barrera
10 Castania Court
St. Augustine, FL 32086

Respectfully submitted,

HINMAN, HOWARD & KATTELL, LLP

Dated: February 18, 2015

By: 

Mark Levy
Attorney for Petitioner
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (606) 723-6605

Page 3 of 3

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| | |
|---|---|
| Steven A. Westlake | ) Cancellation No.: 92/052,260 |
| | ) |
| Petitioner, | ) Mark: THE NATIONAL POLICE |
| | )       GAZETTE THE LEADING |
| v. | )       ILLUSTRATED SPORTING |
| | )       JOURNAL IN AMERICA |
| Edgar Alexander Barrera, | ) |
| | ) Registration No.: 3,662,484 |
| Respondent. | ) |
| | ) |

## AFFIDAVIT OF PETITIONER'S ATTORNEY, MARK LEVY

Mark Levy, attorney for the Petitioner, affirms the following facts.

1. On February 12, 2015, I completed a Response to the Order to Show Cause dated January 28, 2015 and forwarded same to my paralegal, Ms. Amy Manzer, by email. I expected the completed response would be filed that evening or, at the latest, the morning of February 13, 2015.

2. Although Ms. Manzer is located in my law firm's main office in Binghamton, New York, I reside in Florida.

3. In the normal course of business, I often correspond with Ms. Manzer by email.

4. Unbeknownst to me, Ms. Manzer was involved in a serious automobile accident on February 8th, due in part to an unusually heavy snow and ice storm.

5. Ms. Manzer's car was totaled.

6. Ms. Manzer failed to travel to her office on February 13th and 17th, and the office was closed due to a national holiday on February 16th.

7. Ms. Manzer visited a physician to evaluate her injured back on February 10, 2015.

8. On returning to her office on February 18, 2015, Ms. Manzer discovered the draft of the Response and notified me that it had not been forwarded to the TTAB the previous week.

9. Ms. Manzer's affidavit is submitted herewith.

10. Under these unfortunate, unforeseen, and unique circumstances, the TTAB is respectfully requested to grant Petitioner's Motion to Accept Delayed Response to the Order to Show Cause.

Respectfully submitted,

Dated: February 18, 2015

By: _____
Mark Levy
Attorney for Petitioner
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (607) 723-6605

Page 2 of 3

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing PETITIONER'S RESPONSE TO TTAB ORDER

TO SHOW CAUSE in re: Steven A. Westlake v. Edgar Alexander Barrera, Opposition

No. 92/052,260, was served on Respondent, this 18th day of February, 2015, by

sending same via First Class Mail, postage prepaid, to:

Edgar Alexander Barrera
10 Castania Court
St. Augustine, FL 32086

Respectfully submitted,

HINMAN, HOWARD & KATTELL, LLP

Dated: February 18, 2015

By: Mark Levy
Attorney for Petitioner
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (606) 723-6605

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

|  |  |  |
|---|---|---|
| Steven A. Westlake | ) | Cancellation No.: 92/052,260 |
|  | ) |  |
|    Petitioner, | ) | Mark: THE NATIONAL POLICE |
|  | ) |    GAZETTE THE LEADING |
|    v. | ) |    ILLUSTRATED SPORTING |
|  | ) |    JOURNAL IN AMERICA |
| Edgar Alexander Barrera, | ) |  |
|  | ) | Registration No.: 3,662,484 |
|    Respondent. | ) |  |

## AFFIDAVIT OF PETITIONER'S ATTORNEY'S PARALEGAL, AMY MANZER

Amy Manzer, attorney's paralegal, affirms the following facts.

1. My name is Amy Manzer and I am the paralegal responsible for handling work, as assigned, by Mark Levy, Esq. in the firm of Hinman Howard & Kattell, LLP.

2. During the first week in the month of February, 2015, Binghamton, the city at which my law firm has its main office, received significant snow and ice.

3. In fact, as a cause of the snow/ice, my automobile was in a severe accident on February 8, 2015, deploying my air bags, injuring my chest and back, and totaling the car.

4. I visited a physician at the local hospital to receive medical treatment for my back on February 10, 2015.

5. Due to having to find alternate transportation, empty my totaled car, and search for a new vehicle, I was not in the office on February 13th and February 17th. The office was closed for President's Day, a national holiday, on February 16th.

6. When I returned to the office on Feb, 18th, I discovered that Mr. Levy's email with the subject Response was in my computer's email inbox.

Respectfully submitted,

Dated: February 18, 2015

By: _Amy Manzer_
Amy Manzer
Paralegal
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (607) 723-6605

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

|  |  |  |
|---|---|---|
| Steven A. Westlake | ) | Cancellation No.: 92/052,260 |
|  | ) |  |
| Petitioner, | ) | Mark: THE NATIONAL POLICE |
|  | ) | GAZETTE THE LEADING |
| v. | ) | ILLUSTRATED SPORTING |
|  | ) | JOURNAL IN AMERICA |
| Edgar Alexander Barrera, | ) |  |
|  | ) | Registration No.: 3,662,484 |
| Respondent. | ) |  |

## PETITIONER'S RESPONSE TO TTAB ORDER TO SHOW CAUSE

Comes now Mark Levy, attorney for Petitioner Steven A. Westlake, and hereby submits a response to the TTAB Order to Show Cause in the above-captioned cancellation proceeding.

## PRELIMINARY STATEMENT

1. This is in response to the decision of this honorable Trademark Trial and Appeal Board dated January 28, 2015, which, *inter alia*, ordered Petitioner to show cause why this action should not be dismissed for failure to prosecute.

2. Petitioner commenced this cancellation proceeding on March 19, 2010.

3. The proceeding has languished for nearly five years because Respondent has
sought numerous extensions of time to meet discovery deadlines, to retain counsel
(which Respondent never did), and to recover from alleged medical emergencies.

4. Despite the Board repeatedly granting Respondent extensions and a stay of
the proceedings, Respondent has failed to submit any substantive evidence to oppose
Petitioner's allegations that his mark was fraudulently obtained, the mark not being used
prior to April, 2007, and improperly registered.

5. Respondent also failed to timely move to dismiss when Petitioner inadvertently
failed to submit evidence during Petitioner's trial period.

6. The Board, however, *sua sponte,* ordered Petitioner to show cause why
Petitioner's claim should not be dismissed for failure to prosecute.

7. Whether a party has demonstrated good cause sufficient to overcome an order
to show cause for failure to prosecute "is at bottom an equitable [determination] . . . ."[1]

8. Based on the facts of this case and applicable law, equity strongly favors that
the Board should withdraw its order to show cause, permit Petitioner to proceed with its
evidentiary submissions, and allow this case to be resolved on the merits.

## ARGUMENT

## STANDARD

9. Whether a party has demonstrated sufficient cause to avoid dismissal for
failure to prosecute is determined based on four factors:

---

[1] *Pumpkin, Ltd. v. Seed Corps,* 43 U.S.P.Q.2D 1582, 1586 (TTAB 1997); *see also* 37
CFR 2.132 (requiring a showing of good cause to overcome an order to show cause
why a claim should not be dismissed for failure to prosecute).

(1) the danger of prejudice to the non-moving party; (2) the length of delay
and its potential impact on judicial proceedings; (3) the reason for the
delay, including whether it was within the reasonable control of the moving
party; and, (4) whether the moving party has acted in good faith.

*Melwani v. Allegiance Corp.*, 97 U.S.P.Q.2D 1537, 1541 (TTAB 2010).

10. Although some Courts have held the third factor may be the most important
in a particular case, "the determination of whether a party's neglect is excusable is at
bottom an equitable one," *Pumpkin, Ltd. v. Seed Corps*, 43 U.S.P.Q.2D 1582, 1586
(TTAB 1997), and "all relevant circumstances" should be considered, *Melwani*, 97
U.S.P.Q.2D at 1541.

## POINT I

### RESPONDENT WILL NOT BE PREJUDICED IF THE BOARD
### PERMITS PETITIONER TO SUBMIT EVIDENCE

11. Although Respondent's numerous extensions caused this proceeding to
languish, the extensions permitted the completion of discovery.

12. As a result, each party need only submit its evidence in order for the Board to
determine this case on the merits.

13. Permitting Petitioner to reopen the proceedings will therefore not prejudice
Respondent's ability to prove his case.

14. Further, Respondent's own actions have caused this proceeding to extend for
nearly five years.

15. Respondent therefore cannot be heard to complain that prejudice will result from reopening the proceedings for the short period of time required to permit each party to submit evidence so that the Board may decide this case on the merits.

16. Because "the law favors judgments on the merits wherever possible," *Hewlett-Packard Co. v. Olympus Corp.*, 931 F.2d 1551, 1554 (Fed. Cir. 1991), and Respondent will not be prejudiced, this factor favors reopening the case so that Petitioner may submit the evidence he has gathered in support of his claims.

## POINT II

### REOPENING THE CASE SO THAT PETITIONER MAY SUBMIT EVIDENCE WILL NOT CAUSE A SIGNIFICANT DELAY OR UNDULY PREJUDICE THIS BOARD'S ADMINISTRATION OF ITS JUDICIAL PROCEEDINGS

17. Petitioner respects that this case has been before the Board for a significant amount of time.

18. However, any delay caused by reopening the proceedings will be slight. As noted, this case is nearly complete.

19. Both parties have completed discovery.

20. Each party needs only to submit its evidence to enable the Board to decide this case on the merits.

21. Thus, when all relative factors are considered – especially the numerous extensions of time the Board granted to Respondent – equity strongly favors granting Petitioner this one, relatively minor extension of time so that the case may be decided on the merits. *See Pumpkin*, 43 U.S.P.Q.2D at 1586 (equity governs dismissals for

failure to prosecute); *Hewlett-Packard Co.*, 931 F.2d at 1554 (cases should be decided on the merits, when possible).

## POINT III

### WHEN CONSIDERED AMONG THE TOTALITY OF CIRCUMSTANCES, THE REASONS PETITIONER FAILED TO TIMELY SUBMIT EVIDENCE DO NOT WARRANT DISMISSAL

22. Petitioner's failure to submit evidence primarily resulted from the difficulty Petitioner has endured to continue publishing *The National Police Gazette* on a monthly basis while simultaneously remaining abreast of and responding to Respondent's numerous requests for extensions and stays.

23. Trial dates for this proceeding have been set and then resent three times, adding to the confusion due to Respondent's repeated requests for adjournments on May 7, 2010, August 13, 2010, October 8, 2010, January 7, 2011, April 6, 2011, October 11, 2011, November 10, 2011, December 12, 2011, January 3, 2012, January 6, 2012, February 3, 2012, March 14, 2012, May 11, 2012, July 15, 2012, November 13, 2012, January 21, 2013, and October 6, 2013.

24. Respondent's failure to timely submit initial disclosures and repeated news of Respondent's arrests for offenses involving drugs, fraud, and violence caused Petitioner to increasingly investigate the facts surrounding this dispute so that Petitioner could properly respond to Respondent's numerous motions. See Ex. A.

25. Respondent's actions, including requesting adjournments for transporting a sick relative to the hospital and alleging illness that made it impossible to assist his attorney, difficulty retaining substitute counsel, and impossible to proceed *pro se*, but

being well enough to update his Facebook page under the pseudonym, Alexander Patrick, and to be arrested for assault (Ex. B) and his enlistment of his non-attorney sister to represent him, constitutes an abuse of process.

26. "The elements of a claim for abuse of process are: (1) an ulterior motive; and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." *Ferrari S.p.A. Esercizio Fabbriche Automobili E Corse v. McBurnie Coachcraft Inc.,* 10 U.S.P.Q.2d 1278, Civ. No. 86-1812-B(IEG), 1988 U.S. Dist. LEXIS 16314, at *30 (S.D. Cal. Aug. 31, 1988).

27. Here, Respondent sought extensions of time on 18 occasions to obtain new counsel. However, this Board found that Respondent's efforts to secure counsel were insufficient as a matter of law and, to date, Respondent remains unrepresented.

28. Respondent's numerous extensions were therefore veiled attempts to unduly delay this proceeding. Under the law, such conduct amounts to an abuse of process. *See Ferrari S.p.A.,* supra. In light of such abuse, equity strongly favors permitting Petitioner to submit evidence so that the case may be decided on the merits.

29. Petitioner respectfully asserts that the foregoing reasons for the delay are understandable in light of how this case has proceeded.

30. When considered among the totality of factors discussed herein, Petitioner respectfully believes that equity favors permitting Petitioner to reopen these proceedings. *See Melwani v. Allegiance Corp.*, 97 U.S.P.Q.2D 1537, 1541 (TTAB 2010) (holding the Board should consider "all the relevant circumstances" when deciding whether to dismiss a case for failure to prosecute).

# POINT IV

## PETITIONER HAS PROCEEDED IN GOOD FAITH, RESPONDENT HAS NOT

31. Petitioner has always acted in good faith throughout the course of these proceedings.

32. Petitioner responded to each of Respondent's motions, and did not oppose several of Respondent's initial requests for extensions.

33. Further, Petitioner's Amended Petition included substantial documentary evidence which laid bare the thrust of Petitioner's claim so that Respondent could prepare a defense.

34. Petitioner has never abandoned his claim.

35. Respondent, however, has demonstrated bad faith throughout this case, his actions being tantamount to perpetrating fraud on the U.S. Patent and Trademark Office.

36. As stated hereinabove, Respondent's numerous extensions were veiled attempts to unduly delay this proceeding.

37. Under the law, such conduct amounts to an abuse of process. *See Ferrari S.p.A.*, supra.

38. Most notably, after delaying these proceedings for eleven months so that he could retain new counsel, Respondent never retained counsel and is prosecuting this case *pro se*.

39. Further, during the time which Respondent sought extensions to recover from medical emergencies, Respondent was arrested for offenses involving drugs, fraud, and assaulting a police officer. See Ex. A.

## CONCLUSION

40. For the majority of the nearly five years during which this proceeding has pended, Petitioner has diligently prosecuted this case in spite of the 18 requests for adjournments, delays and complications Respondent has caused.

41. This case is now nearly complete and can be resolved on the merits.

42. The Board has granted Respondent numerous extensions of time despite the bad faith Respondent has exhibited.

43. Petitioner should be granted this one extension of time to submit evidence.

Respectfully submitted,

HINMAN, HOWARD & KATTELL, LLP

Dated: February 18, 2015

By: _____

Mark Levy
Attorney for Petitioner
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (607) 723-6605

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing PETITIONER'S RESPONSE TO TTAB

ORDER TO SHOW CAUSE in re: Steven A. Westlake v. Edgar Alexander Barrera,

Opposition No. 92/052,260, was served on Respondent, this 18th day of February, 2015,

by sending same via First Class Mail, postage prepaid, to:

Edgar Alexander Barrera
10 Castania Court
St. Augustine, FL 32086

Respectfully submitted,

HINMAN, HOWARD & KATTELL, LLP

Dated: February 18, 2015

By: _____
Mark Levy
Attorney for Petitioner
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (606) 723-6605

*Trademark Trial and Appeal Board Electronic Filing System. http //estta.uspto.gov*

ESTTA Tracking number: **ESTTA656584**

Filing date: **02/18/2015**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| Proceeding | 92052260 |
|---|---|
| Party | Plaintiff<br>Steven Westlake |
| Correspondence<br>Address | MARK LEVY<br>HINMAN HOWARD KATTELL LLP<br>80 EXCHANGE STREET, PO BOX 5250<br>BINGHAMTON, NY 13901<br>UNITED STATES<br>mlevy@hhk.com |
| Submission | Other Motions/Papers |
| Filer's Name | Mark Levy |
| Filer's e-mail | mlevy@hhk.com,amanzer@hhk.com |
| Signature | /Mark Levy/ |
| Date | 02/18/2015 |
| Attachments | Motion to Accept Delayed Response 021815.pdf(71736 bytes )<br>POLICE GAZETTE Response to TTAB Order to Show Cause 021815.pdf(45428<br>bytes ) |

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

Steven A. Westlake            )    Cancellation No.: 92/052,260
                              )
            Petitioner,       )    Mark: THE NATIONAL POLICE
                              )          GAZETTE THE LEADING
     v.                       )          ILLUSTRATED SPORTING
                              )          JOURNAL IN AMERICA
Edgar Alexander Barrera,      )
                              )    Registration No.: 3,662,484
            Respondent.       )
_____)

# PETITIONER'S MOTION TO ACCEPT DELAYED RESPONSE

## TO THE ORDER TO SHOW CAUSE

Comes now Mark Levy, attorney for Petitioner Steven A. Westlake, and hereby

submits a Motion to Accept Delayed Response in the above-captioned cancellation

proceeding.

Due to unforeseen circumstances beyond Petitioner's control, Petitioner hereby

moves this honorable Trademark Trial and Appeal Board to accept a delayed response

to the Order to Show Cause dated January 28, 2015 due to excusable neglect, as

described in detail in supporting Affidavits by Mark Levy and Amy Manzer, submitted

herewith.

Page 1 of 3

Respectfully submitted,

Dated: February 18, 2015                    By: 

Mark Levy
Attorney for Petitioner
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (607) 723-6605

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing PETITIONER'S MOTION TO ACCEPT

DELAYED RESPONSE TO THE ORDER TO SHOW CAUSE in re: Steven A. Westlake

v. Edgar Alexander Barrera, Opposition No. 92/052,260, was served on Respondent,

this 18th day of February, 2015, by sending same via First Class Mail, postage prepaid,

to:

> Edgar Alexander Barrera
> 10 Castania Court
> St. Augustine, FL 32086

Respectfully submitted,

HINMAN, HOWARD & KATTELL, LLP

Dated: February 18, 2015                    By: _____

Mark Levy
Attorney for Petitioner
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (606) 723-6605

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

Steven A. Westlake ) Cancellation No.: 92/052,260
)
Petitioner, ) Mark: THE NATIONAL POLICE
) GAZETTE THE LEADING
v. ) ILLUSTRATED SPORTING
) JOURNAL IN AMERICA
Edgar Alexander Barrera, )
) Registration No.: 3,662,484
Respondent. )

## AFFIDAVIT OF PETITIONER'S ATTORNEY, MARK LEVY

Mark Levy, attorney for the Petitioner, affirms the following facts.

1. On February 12, 2015, I completed a Response to the Order to Show Cause dated January 28, 2015 and forwarded same to my paralegal, Ms. Amy Manzer, by email. I expected the completed response would be filed that evening or, at the latest, the morning of February 13, 2015.

2. Although Ms. Manzer is located in my law firm's main office in Binghamton, New York, I reside in Florida.

3. In the normal course of business, I often correspond with Ms. Manzer by email.

Page 1 of 3

4. Unbeknownst to me, Ms. Manzer was involved in a serious automobile accident on February 8th, due in part to an unusually heavy snow and ice storm.

5. Ms. Manzer's car was totaled.

6. Ms. Manzer failed to travel to her office on February 13th and 17th, and the office was closed due to a national holiday on February 16th.

7. Ms. Manzer visited a physician to evaluate her injured back on February 10, 2015.

8. On returning to her office on February 18, 2015, Ms. Manzer discovered the draft of the Response and notified me that it had not been forwarded to the TTAB the previous week.

9. Ms. Manzer's affidavit is submitted herewith.

10. Under these unfortunate, unforeseen, and unique circumstances, the TTAB is respectfully requested to grant Petitioner's Motion to Accept Delayed Response to the Order to Show Cause.

Respectfully submitted,

Dated: February 18, 2015

By:
Mark Levy
Attorney for Petitioner
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (607) 723-6605

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing PETITIONER'S RESPONSE TO TTAB ORDER

TO SHOW CAUSE in re: Steven A. Westlake v. Edgar Alexander Barrera, Opposition

No. 92/052,260, was served on Respondent, this 18th day of February, 2015, by

sending same via First Class Mail, postage prepaid, to:

Edgar Alexander Barrera
10 Castania Court
St. Augustine, FL 32086

Respectfully submitted,

HINMAN, HOWARD & KATTELL, LLP

Dated: February 18, 2015

By: _____
Mark Levy
Attorney for Petitioner
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (606) 723-6605

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

Steven A. Westlake

    Petitioner,

  v.

Edgar Alexander Barrera,

    Respondent.

Cancellation No.: 92/052,260

Mark: THE NATIONAL POLICE
   GAZETTE THE LEADING
   ILLUSTRATED SPORTING
   JOURNAL IN AMERICA

Registration No.: 3,662,484

## AFFIDAVIT OF PETITIONER'S ATTORNEY'S PARALEGAL, AMY MANZER

Amy Manzer, attorney's paralegal, affirms the following facts.

1. My name is Amy Manzer and I am the paralegal responsible for handling work, as assigned, by Mark Levy, Esq. in the firm of Hinman Howard & Kattell, LLP.

2. During the first week in the month of February, 2015, Binghamton, the city at which my law firm has its main office, received significant snow and ice.

3. In fact, as a cause of the snow/ice, my automobile was in a severe accident on February 8, 2015, deploying my air bags, injuring my chest and back, and totaling the car.

4. I visited a physician at the local hospital to receive medical treatment for my back on February 10, 2015.

5. Due to having to find alternate transportation, empty my totaled car, and search for a new vehicle, I was not in the office on February 13th and February 17th. The office was closed for President's Day, a national holiday, on February 16th.

6. When I returned to the office on Feb, 18th, I discovered that Mr. Levy's email with the subject Response was in my computer's email inbox.

Respectfully submitted,

Dated: February 18, 2015

By: _Amy Manzer_
Amy Manzer
Paralegal
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (607) 723-6605

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| | |
|---|---|
| Steven A. Westlake | Cancellation No.: 92/052,260 |
| Petitioner, | Mark: THE NATIONAL POLICE GAZETTE THE LEADING ILLUSTRATED SPORTING JOURNAL IN AMERICA |
| v. | |
| Edgar Alexander Barrera, | Registration No.: 3,662,484 |
| Respondent. | |

## PETITIONER'S RESPONSE TO TTAB ORDER TO SHOW CAUSE

Comes now Mark Levy, attorney for Petitioner Steven A. Westlake, and hereby submits a response to the TTAB Order to Show Cause in the above-captioned cancellation proceeding.

## PRELIMINARY STATEMENT

1. This is in response to the decision of this honorable Trademark Trial and Appeal Board dated January 28, 2015, which, *inter alia*, ordered Petitioner to show cause why this action should not be dismissed for failure to prosecute.

2. Petitioner commenced this cancellation proceeding on March 19, 2010.

3. The proceeding has languished for nearly five years because Respondent has sought numerous extensions of time to meet discovery deadlines, to retain counsel (which Respondent never did), and to recover from alleged medical emergencies.

4. Despite the Board repeatedly granting Respondent extensions and a stay of the proceedings, Respondent has failed to submit any substantive evidence to oppose Petitioner's allegations that his mark was fraudulently obtained, the mark not being used prior to April, 2007, and improperly registered.

5. Respondent also failed to timely move to dismiss when Petitioner inadvertently failed to submit evidence during Petitioner's trial period.

6. The Board, however, *sua sponte,* ordered Petitioner to show cause why Petitioner's claim should not be dismissed for failure to prosecute.

7. Whether a party has demonstrated good cause sufficient to overcome an order to show cause for failure to prosecute "is at bottom an equitable [determination] . . . ."[1]

8. Based on the facts of this case and applicable law, equity strongly favors that the Board should withdraw its order to show cause, permit Petitioner to proceed with its evidentiary submissions, and allow this case to be resolved on the merits.

## **ARGUMENT**

### **STANDARD**

9. Whether a party has demonstrated sufficient cause to avoid dismissal for failure to prosecute is determined based on four factors:

---

[1] *Pumpkin, Ltd. v. Seed Corps*, 43 U.S.P.Q.2D 1582, 1586 (TTAB 1997); *see also* 37 CFR 2.132 (requiring a showing of good cause to overcome an order to show cause why a claim should not be dismissed for failure to prosecute).

(1) the danger of prejudice to the non-moving party; (2) the length of delay

and its potential impact on judicial proceedings; (3) the reason for the

delay, including whether it was within the reasonable control of the moving

party; and, (4) whether the moving party has acted in good faith.

*Melwani v. Allegiance Corp.*, 97 U.S.P.Q.2D 1537, 1541 (TTAB 2010).

10. Although some Courts have held the third factor may be the most important

in a particular case, "the determination of whether a party's neglect is excusable is at

bottom an equitable one," *Pumpkin, Ltd. v. Seed Corps*, 43 U.S.P.Q.2D 1582, 1586

(TTAB 1997), and "all relevant circumstances" should be considered, *Melwani*, 97

U.S.P.Q.2D at 1541.

## POINT I

### RESPONDENT WILL NOT BE PREJUDICED IF THE BOARD
### PERMITS PETITIONER TO SUBMIT EVIDENCE

11. Although Respondent's numerous extensions caused this proceeding to

languish, the extensions permitted the completion of discovery.

12. As a result, each party need only submit its evidence in order for the Board to

determine this case on the merits.

13. Permitting Petitioner to reopen the proceedings will therefore not prejudice

Respondent's ability to prove his case.

14. Further, Respondent's own actions have caused this proceeding to extend for

nearly five years.

15. Respondent therefore cannot be heard to complain that prejudice will result

from reopening the proceedings for the short period of time required to permit each

party to submit evidence so that the Board may decide this case on the merits.

16. Because "the law favors judgments on the merits wherever possible,"

Hewlett-Packard Co. v. Olympus Corp., 931 F.2d 1551, 1554 (Fed. Cir. 1991), and

Respondent will not be prejudiced, this factor favors reopening the case so that

Petitioner may submit the evidence he has gathered in support of his claims.

## POINT II

### REOPENING THE CASE SO THAT PETITIONER MAY SUBMIT EVIDENCE WILL NOT CAUSE A SIGNIFICANT DELAY OR UNDULY PREJUDICE THIS BOARD'S ADMINISTRATION OF ITS JUDICIAL PROCEEDINGS

17. Petitioner respects that this case has been before the Board for a significant

amount of time.

18. However, any delay caused by reopening the proceedings will be slight. As

noted, this case is nearly complete.

19. Both parties have completed discovery.

20. Each party needs only to submit its evidence to enable the Board to decide

this case on the merits.

21. Thus, when all relative factors are considered – especially the numerous

extensions of time the Board granted to Respondent – equity strongly favors granting

Petitioner this one, relatively minor extension of time so that the case may be decided

on the merits. See Pumpkin, 43 U.S.P.Q.2D at 1586 (equity governs dismissals for

failure to prosecute); *Hewlett-Packard Co.*, 931 F.2d at 1554 (cases should be decided on the merits, when possible).

## POINT III

### WHEN CONSIDERED AMONG THE TOTALITY OF CIRCUMSTANCES, THE REASONS PETITIONER FAILED TO TIMELY SUBMIT EVIDENCE DO NOT WARRANT DISMISSAL

22. Petitioner's failure to submit evidence primarily resulted from the difficulty Petitioner has endured to continue publishing *The National Police Gazette* on a monthly basis while simultaneously remaining abreast of and responding to Respondent's numerous requests for extensions and stays.

23. Trial dates for this proceeding have been set and then resent three times, adding to the confusion due to Respondent's repeated requests for adjournments on May 7, 2010, August 13, 2010, October 8, 2010, January 7, 2011, April 6, 2011, October 11, 2011, November 10, 2011, December 12, 2011, January 3, 2012, January 6, 2012, February 3, 2012, March 14, 2012, May 11, 2012, July 15, 2012, November 13, 2012, January 21, 2013, and October 6, 2013.

24. Respondent's failure to timely submit initial disclosures and repeated news of Respondent's arrests for offenses involving drugs, fraud, and violence caused Petitioner to increasingly investigate the facts surrounding this dispute so that Petitioner could properly respond to Respondent's numerous motions. See Ex. A.

25. Respondent's actions, including requesting adjournments for transporting a sick relative to the hospital and alleging illness that made it impossible to assist his attorney, difficulty retaining substitute counsel, and impossible to proceed *pro se*, but

being well enough to update his Facebook page under the pseudonym, Alexander
Patrick, and to be arrested for assault (Ex. B) and his enlistment of his non-attorney
sister to represent him, constitutes an abuse of process.

26. "The elements of a claim for abuse of process are: (1) an ulterior motive; and
(2) a willful act in the use of the process not proper in the regular conduct of the
proceeding." *Ferrari S.p.A. Esercizio Fabbriche Automobili E Corse v. McBurnie
Coachcraft Inc.,* 10 U.S.P.Q.2d 1278, Civ. No. 86-1812-B(IEG), 1988 U.S. Dist. LEXIS
16314, at *30 (S.D. Cal. Aug. 31, 1988).

27. Here, Respondent sought extensions of time on 18 occasions to obtain new
counsel. However, this Board found that Respondent's efforts to secure counsel were
insufficient as a matter of law and, to date, Respondent remains unrepresented.

28. Respondent's numerous extensions were therefore veiled attempts to unduly
delay this proceeding. Under the law, such conduct amounts to an abuse of process.
*See Ferrari S.p.A.*, supra. In light of such abuse, equity strongly favors permitting
Petitioner to submit evidence so that the case may be decided on the merits.

29. Petitioner respectfully asserts that the foregoing reasons for the delay are
understandable in light of how this case has proceeded.

30. When considered among the totality of factors discussed herein, Petitioner
respectfully believes that equity favors permitting Petitioner to reopen these
proceedings. *See Melwani v. Allegiance Corp.*, 97 U.S.P.Q.2D 1537, 1541 (TTAB
2010) (holding the Board should consider "all the relevant circumstances" when
deciding whether to dismiss a case for failure to prosecute).

# POINT IV

## PETITIONER HAS PROCEEDED IN GOOD FAITH, RESPONDENT HAS NOT

31. Petitioner has always acted in good faith throughout the course of these proceedings.

32. Petitioner responded to each of Respondent's motions, and did not oppose several of Respondent's initial requests for extensions.

33. Further, Petitioner's Amended Petition included substantial documentary evidence which laid bare the thrust of Petitioner's claim so that Respondent could prepare a defense.

34. Petitioner has never abandoned his claim.

35. Respondent, however, has demonstrated bad faith throughout this case, his actions being tantamount to perpetrating fraud on the U.S. Patent and Trademark Office.

36. As stated hereinabove, Respondent's numerous extensions were veiled attempts to unduly delay this proceeding.

37. Under the law, such conduct amounts to an abuse of process. *See Ferrari S.p.A.*, supra.

38. Most notably, after delaying these proceedings for eleven months so that he could retain new counsel, Respondent never retained counsel and is prosecuting this case *pro se*.

39. Further, during the time which Respondent sought extensions to recover from medical emergencies, Respondent was arrested for offenses involving drugs, fraud, and assaulting a police officer. See Ex. A.

Page 7 of 9

## CONCLUSION

40. For the majority of the nearly five years during which this proceeding has

pended, Petitioner has diligently prosecuted this case in spite of the 18 requests for

adjournments, delays and complications Respondent has caused.

41. This case is now nearly complete and can be resolved on the merits.

42. The Board has granted Respondent numerous extensions of time despite the

bad faith Respondent has exhibited.

43. Petitioner should be granted this one extension of time to submit evidence.

Respectfully submitted,

HINMAN, HOWARD & KATTELL, LLP

Dated: February 18, 2015

By:

Mark Levy
Attorney for Petitioner
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (607) 723-6605

Page 8 of 9

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing PETITIONER'S RESPONSE TO TTAB

ORDER TO SHOW CAUSE in re: Steven A. Westlake v. Edgar Alexander Barrera,

Opposition No. 92/052,260, was served on Respondent, this 18th day of February, 2015,

by sending same via First Class Mail, postage prepaid, to:

Edgar Alexander Barrera
10 Castania Court
St. Augustine, FL 32086

Respectfully submitted,

HINMAN, HOWARD & KATTELL, LLP

Dated: February 18, 2015

By: 

Mark Levy
Attorney for Petitioner
80 Exchange Street
P.O. Box 5250
Binghamton, NY 13901
Tel: (607) 231-6830
Fax: (606) 723-6605

Page 9 of 9

Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov

ESTTA Tracking number: **ESTTA663474**

Filing date: **03/27/2015**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| Proceeding | 92052260 |
|---|---|
| Party | Defendant<br>Edgar Alexander Barrera |
| Correspondence Address | EDGAR ALEXANDER BARRERA<br>BY MELISSA BARRERA POWER OF ATTORNEY<br>22159 LADERA STREET<br>GRAND TERRACE, CA 92313<br>UNITED STATES<br>axlellism@netbusiness.com |
| Submission | Other Motions/Papers |
| Filer's Name | Edgar Alexander Barrera |
| Filer's e-mail | axlellism@netbusiness.com |
| Signature | /edgaralexanderbarrera/ |
| Date | 03/27/2015 |
| Attachments | trademark march 27.pdf(38008 bytes ) |

## IMPORTANT MESSAGE TO THE TTAB

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

Cancellation No. 92/052,260
(Serial No. 77/378,015)

## RESPONDENT'S RESPONSE TO OPPOSITION

The Petitioner has not sent his response to me and also did not send it at my correct address. I have constantly waited for it but **nothing** from the Plaintiff.

The undersigned by Edgar Alexander Barrera, the Respondent in this particular matter.

I am finishing a proper response to the Plaintiff's responses and will send it to the Trademark Trial and Appeal Board TTAB by tomorrow.

I respectfully request this Honorable Board to understand this important message as the interest of justice can be served. Thank you so much!

Respectfully submitted by:

_____
Edgar Alexander Barrera, Respondent
                        .            Dated: March 26, 2015

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

ESTTA Tracking number: **ESTTA664807**

Filing date: **04/03/2015**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| Proceeding | 92052260 |
|---|---|
| Party | Defendant<br>Edgar Alexander Barrera |
| Correspondence<br>Address | EDGAR ALEXANDER BARRERA<br>BY MELISSA BARRERA POWER OF ATTORNEY<br>22159 LADERA STREET<br>GRAND TERRACE, CA 92313<br>UNITED STATES<br>axlellism@netbusiness.com |
| Submission | Other Motions/Papers |
| Filer's Name | Edgar Alexander Barrera |
| Filer's e-mail | axlellism@netbusiness.com |
| Signature | /edgaralexanderbarrera/ |
| Date | 04/03/2015 |
| Attachments | trademark april 2015.pdf(226997 bytes ) |

# NYS Department of State

# Division of Corporations

## Entity Information

The information contained in this database is current through February 25, 2016.

Selected Entity Name: POLICE GAZETTE SALES INC.
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | POLICE GAZETTE SALES INC. |
| **DOS ID #:** | 1362138 |
| **Initial DOS Filing Date:** | JUNE 19, 1989 |
| **County:** | NASSAU |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | INACTIVE - Dissolution by Proclamation / Annulment of Authority (Sep 29, 1993) |

Information to reinstate a corporation that has been dissolved by proclamation or annulment of authority by proclamation is available on the New York State Department of Taxation and Finance website at www.tax.ny.gov keyword TR-194.1 or by telephone at (518) 485-6027

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

POLICE GAZETTE SALES INC.
55 A MOTOR AVE
FARMINGDALE, NEW YORK, 11735

**Registered Agent**

NONE

This office does not record information regarding

the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate of incorporation, however this information is not recorded and only available by viewing the certificate.

## *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| 200 | No Par Value | |

*Stock information is applicable to domestic business corporations.

## Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| JUN 19, 1989 | Actual | POLICE GAZETTE SALES INC. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

# NYS Department of State

# Division of Corporations

## Entity Information

The information contained in this database is current through February 25, 2016.

Selected Entity Name: THE POLICE GAZETTE MOTION PICTURE CO., INC.

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | THE POLICE GAZETTE MOTION PICTURE CO., INC. |
| **DOS ID #:** | 1828377 |
| **Initial DOS Filing Date:** | JUNE 13, 1994 |
| **County:** | SUFFOLK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | INACTIVE - Dissolution by Proclamation / Annulment of Authority (Sep 23, 1998) |

Information to reinstate a corporation that has been dissolved by proclamation or annulment of authority by proclamation is available on the New York State Department of Taxation and Finance website at www.tax.ny.gov keyword TR-194.1 or by telephone at (518) 485-6027

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

THE POLICE GAZETTE MOTION PICTURE CO., INC.
125 SHERWOOD AVENUE
EAST FARMINGDALE, NEW YORK, 11735

**Registered Agent**

NONE

This office does not record information regarding

the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate of incorporation, however this information is not recorded and only available by <u>viewing the certificate.</u>

### *Stock Information

**# of Shares   Type of Stock   $ Value per Share**

200              No Par Value

*Stock information is applicable to domestic business corporations.

### Name History

**Filing Date    Name Type**                    **Entity Name**

JUN 13, 1994  Actual       THE POLICE GAZETTE MOTION PICTURE CO., INC.

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

# NYS Department of State

# Division of Corporations

## Entity Information

The information contained in this database is current through February 25, 2016.

Selected Entity Name: THE NATIONAL POLICE GAZETTE PUBLISHING COMPANY, INC.

### Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | THE NATIONAL POLICE GAZETTE PUBLISHING COMPANY, INC. |
| **DOS ID #:** | 1205697 |
| **Initial DOS Filing Date:** | SEPTEMBER 30, 1987 |
| **County:** | SUFFOLK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | INACTIVE - Dissolution by Proclamation / Annulment of Authority (Sep 29, 1993) |

Information to reinstate a corporation that has been dissolved by proclamation or annulment of authority by proclamation is available on the New York State Department of Taxation and Finance website at www.tax.ny.gov keyword TR-194.1 or by telephone at (518) 485-6027

### Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
MR. SHEPHARD LANE, ESQ.
2 PARK AVE.
19TH FLOOR
NEW YORK, NEW YORK, 10016

### Registered Agent

NONE

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate of incorporation, however this information is not recorded and only available by viewing the certificate.

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| 200 | No Par Value | |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| SEP 30, 1987 | Actual | THE NATIONAL POLICE GAZETTE PUBLISHING COMPANY, INC. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS Homepage  |  Contact Us

# NYS Department of State

# Division of Corporations

## Entity Information

The information contained in this database is current through February 25, 2016.

Selected Entity Name: THE NATIONAL POLICE GAZETTE, INC.
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | THE NATIONAL POLICE GAZETTE, INC. |
| **DOS ID #:** | 1828420 |
| **Initial DOS Filing Date:** | JUNE 13, 1994 |
| **County:** | SUFFOLK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | INACTIVE - Dissolution by Proclamation / Annulment of Authority (Sep 23, 1998) |

Information to reinstate a corporation that has been dissolved by proclamation or annulment of authority by proclamation is available on the New York State Department of Taxation and Finance website at www.tax.ny.gov keyword TR-194.1 or by telephone at (518) 485-6027

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
THE NATIONAL POLICE GAZETTE, INC.
125 SHERWOOD AVE.
EAST FARMINGDALE, NEW YORK, 11735

**Registered Agent**

NONE

This office does not record information regarding

the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate of incorporation, however this information is not recorded and only available by <u>viewing the certificate.</u>

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| 200 | No Par Value | |

\*Stock information is applicable to domestic business corporations.

**Name History**

| Filing Date | Name Type | Entity Name |
|---|---|---|
| JUN 13, 1994 | Actual | THE NATIONAL POLICE GAZETTE, INC. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

Cancellation No. 92/052,260
(Serial No. 77/378,015)

### RESPONDENT'S RESPONSE TO OPPOSITION
### OF THE PETITIONER'S MOTION TO ACCEPT DELAYED
### RESPONSE TO THE ORDER TO SHOW CAUSE

The Petitioner has not yet sent his response to the Respondent via First Class Mail, postage prepaid, and also it has not sent to my correct address either. I have been constantly waited for it but nothing from the Plaintiff to my correct one: Edgar Alexander Barrera, Respondent, 22159 Ladera Street, Grand Terrace, CA 92313. The Petitioner did not send it properly anyway and thus it should be voided.

The undersigned by **Edgar Alexander Barrera**, the Respondent in this particular matter:

### "AFFIDAVIT OF PETITIONER'S ATTORNEY"

"Mark Levy, attorney for the Petitioner, affirms the following facts."

'1. On February 12, 2015, I completed a Response to the Order to Show Cause dated January 28, 2015 and forwarded same to my paralegal, Ms. Amy Manzer, by email. I expect the completed response would be filing that evening or, at the latest, the morning of February 13, 2015."

"3. In the normal course of business, I often correspond with Ms. Manzer by email."

This is what the Petitioner's Attorney is stating in his own exact words on "Page 1 of 3."

The Petitioner's Attorney correctly states he had to give a Response to the Order to Show Cause dated January 28, 2015.

The Board stated on that particular date: "In view thereof, Petitioner is allowed fifteen days from the date of this order to show cause why judgment should not be rendered against him for failure in to prosecute this case, failing which judgment may be entered against Petitioner." "Mailed: January 28, 2015"

Wednesday, January 28, 2015 "Petitioner is allowed fifteen days from the date of entry this order" which is allowed until Wednesday, February 11, 2015. Very simple, but the Petitioner's Attorney states he will respond on February 12, 2015 a day later. And states he expect the

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

Cancellation No. 92/052,260
(Serial No. 77/378,015)

## RESPONDENT'S RESPONSE TO OPPOSITION
## OF THE PETITIONER'S MOTION TO ACCEPT DELAYED
## RESPONSE TO THE ORDER TO SHOW CAUSE

The Petitioner has not yet sent his response to the Respondent via First Class Mail, postage prepaid, and also it has not sent to my correct address either. I have been constantly waited for it but nothing from the Plaintiff to my correct one: Edgar Alexander Barrera, Respondent, 22159 Ladera Street, Grand Terrace, CA 92313. The Petitioner did not send it properly anyway and thus it should be voided.

The undersigned by **Edgar Alexander Barrera**, the Respondent in this particular matter:

### "AFFIDAVIT OF PETITIONER'S ATTORNEY"

"Mark Levy, attorney for the Petitioner, affirms the following facts."

'1. On February 12, 2015, I completed a Response to the Order to Show Cause dated January 28, 2015 and forwarded same to my paralegal, Ms. Amy Manzer, by email. I expect the completed response would be filing that evening or, at the latest, the morning of February 13, 2015."

"3. In the normal course of business, I often correspond with Ms. Manzer by email."

This is what the Petitioner's Attorney is stating in his own exact words on "Page 1 of 3."

The Petitioner's Attorney correctly states he had to give a Response to the Order to Show Cause dated January 28, 2015.

The Board stated on that particular date: "In view thereof, Petitioner is allowed fifteen days from the date of this order to show cause why judgment should not be rendered against him for failure in to prosecute this case, failing which judgment may be entered against Petitioner." "Mailed: January 28, 2015"

Wednesday, January 28, 2015 "Petitioner is allowed fifteen days from the date of entry this order" which is allowed until Wednesday, February 11, 2015. Very simple, but the Petitioner's Attorney states he will respond on February 12, 2015 a day later. And states he expect the

complete response would be filing that evening or, at the latest, the morning of February 13, 2015. Which is two days after the allowed fifteen days of this order.

The "Affidavit of Petitioner's Attorney Paralegal, Amy Manzer" states she: "was in a severe accident on February 8, 2015, deploying her air bags, injuring her chest and back, and totaling the car. Ms. Manzer visited a physician at the local hospital to receive medical treatment for her back on February 10, 2015. If she was injured why did she wait three days to receive medical treatment. And all of this happened before the evening of February 12, 2015 or the morning of February 13, 2015 which is two days after the allowed fifteen days of the Board order. By in their own words state it was not going to be sent in the correct time before her accident.

Likewise the Petitioner's Attorney also states: ""In the normal course of business, I often correspond with Ms. Manzer by email." He would have then known this already had happened since he corresponds in the normal cause by email daily with her. The whole story does not add up at all about this particular matter.

Wendy Boldt Cohen, Interlocutory Attorney sent:
"Mailed: January 28, 2015"

"Notwithstanding the foregoing, the Board notes that the time for Petitioner to take testimony has expired2 and the record demonstrates that Petitioner has failed to submit any evidence or take any testimony during its assigned testimony period. Cf. Trademark Rule 2.132 and TBMP § 534. In view thereof, Petitioner is allowed fifteen days from the date of this order to show cause why judgment should not be rendered against him for failure to prosecute this case, failing which judgment may be entered against Petitioner. Id. Proceedings are otherwise suspended. Any paper filed during the pendency of this show cause order which is not relevant thereto will be given no consideration. 2 Petitioner's trial period ended July 29, 2014."

I respectfully request this Honorable Board as the interest of justice can be served.

Respectfully submitted by:

Edgar Alexander Barrera, Respondent
22159 Ladera Street
Grand Terrace, CA 92313

Dated: April 3, 2015

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

ESTTA Tracking number:   **ESTTA663474**

Filing date:   **03/27/2015**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
### BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| Proceeding | 92052260 |
|---|---|
| Party | Defendant<br>Edgar Alexander Barrera |
| Correspondence Address | EDGAR ALEXANDER BARRERA<br>BY MELISSA BARRERA POWER OF ATTORNEY<br>22159 LADERA STREET<br>GRAND TERRACE, CA 92313<br>UNITED STATES<br>axlellism@netbusiness.com |
| Submission | Other Motions/Papers |
| Filer's Name | Edgar Alexander Barrera |
| Filer's e-mail | axlellism@netbusiness.com |
| Signature | /edgaralexanderbarrera/ |
| Date | 03/27/2015 |
| Attachments | trademark march 27.pdf(38008 bytes ) |

UNITED STATES PATENT AND TRADEMARK OFFICE
**Trademark Trial and Appeal Board**
**P.O. Box 1451**
**Alexandria, VA 22313-1451**
General Contact Number: 571-272-8500

dmd

Mailed: April 9, 2015

Cancellation No. 92052260

Steven Westlake

v.

Edgar Alexander Barrera

**By the Board:**

Petitioner's response to the Board's order to show cause (filed February 18, 2015) fails to indicate proof of service on Respondent's address of record in the United States Patent and Trademark Office, as required by Trademark Rule 2.119.

In order to expedite this matter, a copy of Petitioner's response is forwarded herewith to Respondent.[1] Respondent is allowed until FIFTEEN DAYS from the mailing date of this order in which to file a brief in response to the Petitioner's response, failing which the Board will take further appropriate action. *See* Trademark Rules 2.127(a) and 2.127(e)(1).

Proceedings herein are suspended pending a response from Respondent.

---

[1] Strict compliance with Trademark Rule 2.119 is required in all future filings. When a party filed a document that is required to be served upon every other party to the proceeding, proof that required service has been made must be submitted before the Board will consider the filing.

UNITED STATES PATENT AND TRADEMARK OFFICE
Trademark Trial and Appeal Board
P.O. Box 1451
Alexandria, VA 22313-1451

wbc

Mailed: January 28, 2015

Cancellation No. 92052260

Steven Westlake

v.

Edgar Alexander Barrera

**Wendy Boldt Cohen, Interlocutory Attorney:**

This case comes up before the Board on: 1) Respondent's motion (filed October 6, 2014) for involuntary dismissal pursuant to Trademark Rule 2.132, on the ground that Petitioner has failed to prosecute this case[1] and 2) Petitioner's October 27, 2014 filing.

**Motion for involuntary dismissal**

Regarding Respondent's motion to dismiss under Trademark Rule 2.132, such a motion should be filed before the opening of the testimony period of the moving party. *See* Trademark Rule 2.132(a) and (b); TBMP § 534. As last reset in the Board's January 16, 2014 order, Respondent's testimony period closed September 27, 2014. In this instance, Respondent untimely filed its motion to dismiss after the close of its testimony period.

---

[1] It is noted the October 6, 2014 motion was filed as a confidential document with the Board. If a party submits any brief, pleading, motion or other such filing containing confidential information either electronically via ESTTA or by paper under seal, the party must also submit for the public record a redacted version of said paper. Thus, for confidential submissions filed either via ESTTA or by paper, two versions are required a confidential version as well as a redacted version available for public view. *See* TBMP § 412.04.

Cancellation No. 92052260

Based on the foregoing, the motion to dismiss will receive no consideration.

**Petitioner's October 27, 2014 filing**

Regarding Petitioner's October 27, 2014 filing, inasmuch as Petitioner argues that "the record shows no genuine issue of material fact," the Board construes the motion as one for summary judgment. A motion for summary judgment is a pretrial device and should be filed prior to the opening of the first testimony period as originally set or as reset. *See* Trademark Rule 2.127(e)(1) and TBMP § 528.02. The Board, in its discretion, may deny as untimely any summary judgment motion filed thereafter. *See La Maur, Inc. v. Bagwells Enterprises, Inc.*, 193 USPQ 234, 235-36 (Comm'r 1976).

Because the first testimony period opened June 29, 2014, Petitioner's October 27, 2014 filing is an untimely motion for summary judgment and will receive no consideration. Respondent's December 10 and 12, 2014 responses thereto are therefore, moot and will receive no consideration.

Notwithstanding the foregoing, the Board notes that the time for Petitioner to take testimony has expired[2] and the record demonstrates that Petitioner has failed to submit any evidence or take any testimony during its assigned testimony period. *Cf.* Trademark Rule 2.132 and TBMP § 534. In view thereof, Petitioner is allowed **fifteen days** from the date of this order to show cause why judgment should not be rendered against him for failure to prosecute this case, failing which judgment may be entered against

---

[2] Petitioner's trial period ended July 29, 2014.

Petitioner. *Id.* Proceedings are otherwise suspended. Any paper filed during the pendency of this show cause order which is not relevant thereto will be given no consideration.

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**Trademark Trial and Appeal Board**
**P.O. Box 1451**
**Alexandria, VA 22313-1451**

wbc

Mailed: January 28, 2015

Cancellation No. 92052260

Steven Westlake

v.

Edgar Alexander Barrera

## Wendy Boldt Cohen, Interlocutory Attorney:

This case comes up before the Board on: 1) Respondent's motion (filed October 6, 2014) for involuntary dismissal pursuant to Trademark Rule 2.132, on the ground that Petitioner has failed to prosecute this case[1] and 2) Petitioner's October 27, 2014 filing.

## Motion for involuntary dismissal

Regarding Respondent's motion to dismiss under Trademark Rule 2.132, such a motion should be filed before the opening of the testimony period of the moving party. *See* Trademark Rule 2.132(a) and (b); TBMP § 534. As last reset in the Board's January 16, 2014 order, Respondent's testimony period closed September 27, 2014. In this instance, Respondent untimely filed its motion to dismiss after the close of its testimony period.

---

[1] It is noted the October 6, 2014 motion was filed as a confidential document with the Board. If a party submits any brief, pleading, motion or other such filing containing confidential information either electronically via ESTTA or by paper under seal, the party must also submit for the public record a redacted version of said paper. Thus, for confidential submissions filed either via ESTTA or by paper, two versions are required a confidential version as well as a redacted version available for public view. *See* TBMP § 412.04.

Based on the foregoing, the motion to dismiss will receive no consideration.

**Petitioner's October 27, 2014 filing**

Regarding Petitioner's October 27, 2014 filing, inasmuch as Petitioner argues that "the record shows no genuine issue of material fact," the Board construes the motion as one for summary judgment. A motion for summary judgment is a pretrial device and should be filed prior to the opening of the first testimony period as originally set or as reset. *See* Trademark Rule 2.127(e)(1) and TBMP § 528.02. The Board, in its discretion, may deny as untimely any summary judgment motion filed thereafter. *See La Maur, Inc. v. Bagwells Enterprises, Inc.,* 193 USPQ 234, 235-36 (Comm'r 1976).

Because the first testimony period opened June 29, 2014, Petitioner's October 27, 2014 filing is an untimely motion for summary judgment and will receive no consideration. Respondent's December 10 and 12, 2014 responses thereto are therefore, moot and will receive no consideration.

Notwithstanding the foregoing, the Board notes that the time for Petitioner to take testimony has expired[2] and the record demonstrates that Petitioner has failed to submit any evidence or take any testimony during its assigned testimony period. *Cf.* Trademark Rule 2.132 and TBMP § 534. In view thereof, Petitioner is allowed **fifteen days** from the date of this order to show cause why judgment should not be rendered against him for failure to prosecute this case, failing which judgment may be entered against

---

[2] Petitioner's trial period ended July 29, 2014.

Petitioner. *Id.* Proceedings are otherwise suspended. Any paper filed during the pendency of this show cause order which is not relevant thereto will be given no consideration.

## Fwd: Westlake v. Barrera (TTAB Opp. No. 92052260)
1 message

**Les** <leseuell@gmail.com>                                            Thu, Feb 25, 2016 at 12:39 PM
To: ods00448cpc@officedepot.com

Sent from my iPhone

Begin forwarded message:

**From:** "Casagrande, Thomas" <Thomas.Casagrande@USPTO.GOV>
**Date:** November 13, 2015 at 2:52:20 PM EST
**To:** "leseuell@gmail.com" <leseuell@gmail.com>
**Cc:** "mlevy@hhk.com" <mlevy@hhk.com>
**Subject: Westlake v. Barrera (TTAB Opp. No. 92052260)**

Dear Mr. Barerra,


It was nice talking to you.  Here is some information relating to the appeal of this case to the
Federal Circuit.


Court website:  http://www.cafc.uscourts.gov/


Clerk's Office telephone #:  (202) 275-8000  (8:30 am to 4:30 pm, Eastern time)


Link to the Trademark
laws:  http://www.uspto.gov/sites/default/files/trademarks/law/Trademark_Statutes.pdf


Please call opposing counsel to ask him to send you everything he has filed to date with the
Federal Circuit.  And please request that he makes sure to send you everything he files in the
future in this appeal.  Opposing counsel is listed as:


                    Mark Levy

Hinman, Howard & Kattell, LLP

80 Exchange Street

Binghamton, NY 13901

Telephone: (607) 231-6380

Email: mlevy@hhk.com

I am copying Mr. Levy so that he is aware that you haven't received anything relating to this appeal yet from him.

Finally, here is a link to the USPTO's Law School Clinic Program:

http://www.uspto.gov/learning-and-resources/ip-policy/public-information-about-practitioners/law-school-clinic-1

You may want to contact one or more of these clinics to determine if one of them ma be willing to assist you pro bono in this appeal if you cannot afford an attorney.

Very truly yours,

Tom Casagrande

**Thomas L. Casagrande** ● Associate Solicitor ● United States Patent and Trademark Office ● Office of the Solicitor ● Main: 571.272.9035 ● Direct: 571.272.7351 ● Fax: 571.273.0373 ● email:thomas.casagrande@uspto.gov ● MAIL: P.O. Box 1450, Mail Stop 8 - Office of the Solicitor, Alexandria, VA 22313-1450 ● HAND DELIVERY: Madison West - 8C43A, 600 Dulany Street, Alexandria, VA 22314

UNITED STATES PATENT AND TRADEMARK OFFICE
**Trademark Trial and Appeal Board**
**P.O. Box 1451**
**Alexandria, VA 22313-1451**
General Contact Number: 571-272-8500

dmd

Mailed: April 9, 2015

Cancellation No. 92052260

Steven Westlake

v.

Edgar Alexander Barrera

**By the Board:**

Petitioner's response to the Board's order to show cause (filed February 18, 2015) fails to indicate proof of service on Respondent's address of record in the United States Patent and Trademark Office, as required by Trademark Rule 2.119.

In order to expedite this matter, a copy of Petitioner's response is forwarded herewith to Respondent.[1]   Respondent is allowed until FIFTEEN DAYS from the mailing date of this order in which to file a brief in response to the Petitioner's response, failing which the Board will take further appropriate action. *See* Trademark Rules 2.127(a) and 2.127(e)(1).

Proceedings herein are suspended pending a response from Respondent.

---

[1] Strict compliance with Trademark Rule 2.119 is required in all future filings. When a party filed a document that is required to be served upon every other party to the proceeding, proof that required service has been made must be submitted before the Board will consider the filing.

# PRIORITY ★ MAIL ★

## FLAT RATE ENVELOPE
ONE RATE ★ ANY WEIGHT*

# PRIORITY ★ MAIL ★


**UNITED STATES POSTAL SERVICE** ®
**VISIT US AT USPS.COM**®
ORDER FREE SUPPLIES ONLINE

**FROM:** Edgar Alexander Barrera
22159 Ladera ST
Grand Terrace, CA 92313

**TO:**



U.S. POSTAGE
**$6.45**
PM 2-DAY
32174  0006
Date of sale
03/02/16
06   2S00
08440232   SSK

## PRIORITY MAIL 2-DAY™

EXPECTED DELIVERY 03/05/2016

SHIP
TO:    Clerk of Court                 **0006**

U.S. Court of Appeals for Fed.

717 Madison Place, NW
Washington, DC 20439

**WASHINGTON DC 20439**

## USPS TRACKING NUMBER



9505 5000 1663 6062 0003 07



PS00001000014

EP14F July 2013
OD: 12.5 x 9.5


UNITED STATES POSTAL SERVICE